SUE FAHAMI
Executive Assistant United States Attorney
District of Nevada
Nevada Bar No. 5634
DANIEL D. HOLLINGSWORTH
Assistant United States Attorney
Nevada Bar No. 1925
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Tel: (702) 388-6336
Fax: (702) 388-6787
Daniel.Hollingsworth@usdoj.gov
*Attorneys for the United States*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:11-CR-347-KJD-MDC |
| Plaintiff, | **Stipulation for Entry of Preliminary Forfeiture Order of U.S. $99,900; 53 1 Ounce gold coins; and a Criminal Forfeiture Money Judgment of $89,718; and Order** |
| v. | |
| DAVID A. LITWIN, | |
| Defendant. | |

The United States of America and David A. Litwin, through his counsel, Lisa Rasmussen, McLetchie Law agree as follows:

1. The Grand Jury returned the Superseding Criminal Indictment (SI) charging, Henri Wetselaar and David A. Litwin in Count 1 with conspiracy to distribute oxycodone, violating 21 U.S.C. §§ 846 and 841(a)(1); Henri Wetselaar and David A. Litwin in Counts 2-9 with Distribution of Controlled Substances, violating 21 U.S.C. § 841(a)(1); Litwin in Counts 10 through 12 with False Statement to Government Agency, violating 18 U.S.C. § 1001; Wetselaar in Count 13 with Money Laundering, violating 18 U.S.C. § 1957; Wetselaar in Count 14 with Structuring Transactions to Evade Reporting Requirement, violating 31 U.S.C. § 5324. The SI provided notice with four Forfeiture Allegations for specific assets and criminal forfeiture money judgments of $3,600,000.[1]

2. In 2017, the jury found Wetselaar guilty of Counts One through Nine, Thirteen, and Fourteen and Litwin guilty of Counts One through Five and Seven through Nine.[2]

---

[1] Superseding Criminal Indictment (SI), ECF No. 179.
[2] Jury Verdict, ECF No. 456.

1

3. At forfeiture, this Court forfeited $99,900 in cash; 53 1 Ounce gold coins; and entered a Criminal Forfeiture Money Judgment of $89,718 as to David A. Litwin.[3]

4. Wetselaar and Litwin appealed. Wetselaar died while his case was on appeal. The Ninth Circuit dismissed his appeal, the conviction, and the superseding indictment as to him.[4] The Ninth Circuit vacated Litwin's convictions and remanded for a new trial.[5]

5. The government filed a Second Amended Bill of Particulars for Forfeiture of Property providing notice to Litwin since the government would pursue forfeiture of $99,900 in cash; 53 1 Ounce gold coins; and a criminal forfeiture money judgment of $89,718.[6]

6. The government filed Proposed Forfeiture Jury Instructions and Special Verdict Form.[7] The Jury found Litwin guilty of Counts One through Five and Counts Seven through Nine.[8]

7. Litwin waived the jury determination of forfeiting specific property.[9]

8. The superseding indictment states, "Beginning at a date unknown and continuing to in and around August 2010."[10] Wetselaar started illegally selling prescription drugs for cash in 2007.[11]

9. Wetselaar handwrote in his blue Memo Book his illegal cash payments each month for each year from 2007 to 2010.[12] Wetselaar obtained $2,257,395 of illegal drug proceeds from 2007 through August 27, 2010, by selling prescriptions illegally.[13]

10. Wetselaar handwrote in the 2009 Day Minder the people for whom he wrote the illegal drug prescriptions, listing the number of people seen each day with a second number as a running or cumulative total of people for each month: 323 people in January 2009; 281

---

[3] Final Order of Forfeiture, ECF No. 735.
[4] Ninth Circuit Order and Mandate, ECF No. 753, 757.
[5] Ninth Circuit Opinion, ECF No. 758.
[6] Second Amended Bill of Particulars for Forfeiture of Property (SABOPF), ECF No. 777.
[7] Proposed Forfeiture Jury Instructions and Special Verdict Form, ECF No. 869.
[8] Verdict Form, ECF No. 908.
[9] Waiver of Determination of Forfeiture by Jury, ECF No. 909.
[10] SI, ECF No. 179:1; Wetselaar's Forfeiture Transcript (WFT), dated October 26, 2017, ECF No. 582:22; Litwin's Forfeiture Transcript (LFT), dated April 22, 2019, ECF No. 744:3-4.
[11] Admitted Second Trial Exhibits (ASTE), ECF No. 910, Ex. 24.
[12] ASTE, ECF No. 910, Ex. 24.
[13] ASTE, ECF No. 910, Ex. 24; SI, ECF No. 179; WFT, ECF No. 582:13-19, 20-24, 34-38.

people in February 2009; 275 people in March 2009; 306 people in April 2009; 219 people in May 2009; 301 people in June 2009. Wetselaar sometimes wrote the cash that each person paid for the types of drugs he illegally prescribed and the total amount of money he collected that day: June 10-11, 13, 16-18, 20. Wetselaar illegally prescribed drugs for 341 people in July 2009; 337 people in August 2009; 362 people in September 2009; 441 people in October 2009; 377 people in November 2009; and 637 people in December 2009. He illegally prescribed drugs to 4200 people in 2009.[14]

11. Wetselaar handwrote a daily list of people who paid cash for illegal drugs in the 2010 Red At-A-Glane Calendar book.[15]

12. Wetselaar handwrote in the 2010 Day Minder book the people to whom he illegally prescribed drugs, listing the number of people seen each day with a second number as a running or cumulative total of people for each month. Wetselaar illegally prescribed drugs for: 701 people in January 2010; for 751 people in February 2010; 733 people in March 2010; 788 people in April 2010; 852 people in May 2010; 1029 people in June 2010; 1171 people in July 2010; and 839 people on August 1 through 27, 2010.[16]

13. Litwin collected the cash payments from the people and handed the cash to Dr. Wetselaar.[17]

14. When DEA executed the issued search warrant at Wetselaar's medical office, it found a plastic accordion folder holding multiple cash payments secured with a paperclip and included patient names and multiple torn-up lists in a garbage can that had discarded visitation lists including individual names with dollar amounts listed next to the names that each patient paid.[18]

15. Wetselaar admitted his medical practice was a cash only business and would accept Medicare and Medicaid patients. An office visit cost between $200 for prescribing Lortab or Percocet and $300 for prescribing Oxycontin or Oxycodone. A patient would pay

---

[14] ASTE, ECF No. 910, Ex. 28A.
[15] ASTE, ECF No. 910, Ex. 25.
[16] ASTE, ECF No. 910, Ex. 28B.
[17] First Trial Exhibits (FTE), ECF No. 486, Ex. 39B; ASTE, ECF No. 910, Ex. 28A; WFT, ECF No. 582:17, 19; Ex. A:8, Affidavit of IRS-CI SA Robert Norris for a criminal search warrant of Bank Accounts issued on October 3, 2011.
[18] Ex. A:7-8.

the cash to Litwin, who gave the cash to Wetselaar at the end of the day. Wetselaar admitted he had a separate business bank account, deposited the cash 3 or 4 times a week, and purposely deposited less than $10,000 each time to circumvent the bank reporting requirements, not filling out the cash transaction report.[19]

16. Wetselaar took in 90% cash from his patients with a dot placed on the file and 10% from Medicare and Medicaid. Carolyn Allen, Jason Kutz, and Salaices brought groups of cash paying people to him. Allen, the most prolific person bringing groups, brought in 8 to 15 people for Allen's appointment time with Wetselaar. If Allen did not come, Salaices brought the group. Allen gave Wetselaar a slip of paper, including the patient's name and current medications before seeing the patients. Allen paid him for all the patient visits. After the last patient left, Allen made one cash payment to Wetselaar for all the patients. The normal cost was $300. If he prescribed Oxycontin, it was $400. Allen received special pricing for her group of people visits, $200 per person regardless of the drug he prescribed. Wetselaar controlled all aspects of the cash, bought Krugerrand gold coins at his office, took it to his residence every day, and did not report his income.[20]

17. Starting in 2005, Wetselaar made house calls for Carol Allen's patients at her house and prescribed Lortab and/or Xanax or Lortab and Soma for each of the 50 patients. Subsequently, Wetselaar prescribed Oxycodone to Allen's approximately 150 patients. Wetselaar and Litwin were concerned about money, demanding $300 per patient visit. Allen refused to pay that amount. They told her the offer was a deal since the going rate for a pain management specialist was $500-$600. Allen paid $125-$150 per patient visit. In October 2010, Wetselaar raised his price per patient visit and wanted to see only 10 patients per each house visit. Allen paid Wetselaar a single lump payment after Wetselaar saw all the patient and prescribed the mediation for each one. Wetselaar preferred cash.[21] Salaices bragged Allen and she brought at least 200 clients to Wetselaar, who illegally prescribed the drugs and subsequently sold them on the street for profit.[22]

---

[19] Ex. A:8-9.
[20] Ex. A:9-10.
[21] Ex. A:11.
[22] Ex. A:6, 9-10.

18. Jason Kutz met Wetselaar and Litwin in the back of Wetselaar's Lincoln car in the parking lot of a Jack in the Box. For each patient Kutz brought and paid to Wetselaar $300, Wetselaar prescribed to each patient 180-260 Roxicodone pills and 60-90 Xanax pills. Wetselaar prescribed to Kutz 50 pills of 80 milligram Oxycontin per month. 80% of the time, Kutz brought a group of 10-15 people to Wetselaar. He paid $300 per patient from his own pocket because he was making so much money.[23]

### A. Wells Fargo Bank Cash Deposits to x9402 and other Bank Accounts

19. Because Wetselaar's income was cash, he made increasing amounts of cash deposits in his personal bank accounts while the New Amsterdam Medical Group (NAMG) business account of medical insurance reimbursements declined. Substantial increases in spending activity occurred including the repayment of a line of credit in excess of $135,000, the purchase of a personal residence in the amount of $103,000, more than $495,000 in growth in personal trading accounts, and increase of coins.[24]

20. The cash deposited into JP Morgan Chase Bank account x3079, Wells Fargo Bank account x9402, and Nevada State Bank personal checking account x3353 were illegal proceeds from Wetselaar's illegally prescribed drugs.[25]

21. From August 2009 to August 10, 2010, cash deposits into Wetselaar's personal bank account, x9402, fluctuated:

**Wells Fargo Bank Monthly Total Cash Deposits to x9402**

| 2008 | | 2009 | | 2010 | |
|---|---|---|---|---|---|
| Month | Cash | Month | Cash | Month | Cash |
|  |  | Jan. | $       900 | Jan. | $    9,000 |
|  |  | Feb. | $   5,960 | Feb. | $  34,000 |
|  |  | Mar. | $   8,700 | Mar. | $  58,700 |
|  |  | Apr. | $   5,500 | Apr.  ………$  51,000 |  |
|  |  | May | $   3,600 | May | $         0 |
|  |  | Jun. | $ 12,900 | Jun. | $  47,300 |
|  |  | Jul. | $ 11,900 | Jul. | $  45,900 |
| Aug. | $0 | Aug. | $ 15,400 | Aug. | $  19,600 |
| Sep. | $0 | Sep. | $   8,500 |  |  |

[23] Ex. A:10-11.
[24] Ex. A:12-20.
[25] Ex. A:12-20; FTE, ECF No. 486, Ex. 31A, Certification of Edwards Jones Business Records; 31B, Edwards Jones Business Records; ASTE, ECF No. 910, Exs. 32A, Certification of Nevada State Bank Records; 32B, Wetselaar's Nevada State Bank Records; 33A, Certification of Wells Fargo Bank Records; 33B, Wetselaar's Wells Fargo Bank Records; 34A, Certification of JP Morgan Chase Bank Records; 34B, Wetselaar's JP Morgan Chase Bank Records.

| | | | | |
|---|---|---|---|---|
| Oct. | $0 | Oct. | $ 48,800 | |
| Nov. | $0 | Nov. | $ 10,000 | |
| Dec. | $0 | Dec. | $ 64,200 | |
| **Total** | **$0** | | **$156,360** | **$265,500** |

22. Cash deposits began in January 2009 and continued to August 2010, when the search warrant was executed.

23. The increase in cash deposits directly correlates to the increase in Wetselaar's controlled substances prescriptions. Wetselaar controlled substance prescribing practices increased from 2,899 to 10,739 prescriptions, more than 270% growth from the previous year. Prior to 2009, Wetselaar deposited no cash into his personal bank account. Beginning in January 2009, and continuing through August 2010, Wetselaar made large cash deposits. This evidence corroborates the increase cash deposits from Litwin's and Wetselaar's illegal sale of prescription drugs. The cash deposits into JP Morgan Chase Bank account x3079, Wells Fargo Bank account x9402, and Nevada State Bank personal checking account x3353, are illegal proceeds of Wetselaar's illegally prescribed drugs.[26]

24. From August 1, 2008, through August 31, 2010, deposits from medical insurance companies into account x3079 decreased. Up until 2010, monthly insurance reimbursements never dropped below $17,000. Beginning on or about January 2010, and continuing until the end of August 2010, insurance reimbursements trended down. January 2010 received the highest reimbursed amount of $11,626.97. From February 2010 through August 2010, medical reimbursements averaged $3,995.94, with no single month exceeding $5,887 in deposits. Four months during this time, medical insurance reimbursements were below $3,000, with the lowest reimbursement being of $2,687.37. The downward trend represented NAMG's decrease in medical insurance claims.[27]

25. When DEA executed the issued search warrant at 3681 Forestcrest Drive, Las Vegas, Nevada 89121, Wetselaar's house, it discovered a plastic zip-loc bag inside a briefcase in an office. Inside the plastic bag were handwritten notes and four flat skeleton keys: two silver keys on a red key ring and two gold keys on black key ring. A handwritten note within the bag read "420257#," "4025=red," "u1656=black," and "40 I OD." A

---

[26] ASTE, ECF No. 910, Ex. 33A and 33B; Ex. A:12-20.
[27] Ex. A:20-21.

separate handwritten note within the plastic bag read "40257#," "Total about 150 gold coins," had the figures "150,000," "160,000," "140,000," "100,000," "100,000," "100,000," "10,000," "760,000," "u 1656 100,000," and "860,000." Adding the first seven numbers listed above appeared to be a tally of numbers that equals the eighth number listed above (760,000). Further, the 760,000 number combined with the ninth number (100,000) equals the tenth number listed on the document (860,000).[28]

26. Law enforcement entered the above code on the keypad at the main entrance to enter 24/7 Private Vault building. A 24/7 Private Vault employee recognized the gold keys typically used by 24/7 Private Vaults for dual lock boxes and the silver keys are typically used for single lock boxes. The safe deposit boxes 4010, 4025, and 1656 were at 24/7 Private Vault.[29] Law enforcement obtained a criminal search warrant for the three boxes.

27. In safe deposit box 4025, law enforcement found rental applications and agreements with safe deposit box number portions torn off, gold coins, and silver coins. In safe deposit box 1656, law enforcement found U.S. cash currency banded and marked "$50,000," an application and rental agreement for safe deposit box 1656, and at least two additional rental applications and agreements with safe deposit box number portions torn off. A 24/7 Private Vault employee stated safe deposit box 1023 was connected to safe deposit box 4010 because they had matching retinal scans, but the retinal scan for safe deposit box 1023 was locked out of the system.[30]

**B. LITWIN**

29. Litwin participated in collecting cash payments and on some occasions facilitated the filling of prescriptions when Wetselaar was out of town.[31]

30. The government found in safe deposit box 4010: an application and rental agreements for safe deposit boxes 4010 and 1023; numerus assets.[32]

---

[28] Ex. B:5-6, Affidavit of IRS-CI SA Robert Norris for a criminal search warrant of Safe Deposit Boxes 4010, 4025, and 1656 at 24/7 Private Vaults issued on October 3, 2011.
[29] Ex. B.
[30] Ex. C:3-6, Affidavit of IRS-CI SA Robert Norris for a criminal search warrant of Safe Deposit 1023 at 24/7 Private Vaults issued on October 5, 2011.
[31] FTE, ECF No. 486, Ex. 39B.
[32] Ex. B:6-8; Ex. C:3-6; Exs. D, Search Warrant Inventory List of Deposit Box 4010 of 24/7 Private Vault; D-1, U.S. Currency, D-2 Foreign Currency; D-3 Precious Metals.

31. In safe deposit box 1023, law enforcement found US$99,900 and 3 1 oz. coins.[33]

32. During the conspiracy from 2007 through August 27, 2010, the government found the illegal proceeds and the property traceable to the illegal proceeds from the illegally prescribed drugs: cash, precious metal, coins; Wetselaar purchased coins by cash and check from the American Coin Express; Wetselaar's financial records: Edward Jones Financial Records, Nevada State Bank Records, Wells Fargo Bank Records, and JP Morgan Chase Bank Records showed flows of illegal proceeds into and out of them through financial transactions. Wetselaar moved from insurance company payments to cash payments deposits of illegal proceeds from his illegally prescribed drugs that Litwin was involved and knowingly received the illegal proceeds as payments and gifts from Wetselaar.[34]

33. Even after the search of Wetselaar's medical offices and house, Wetselaar continued to prescribe illegal drugs at his medical office. From August 31, 2010, to October 3, 2011, Wetselaar had illegally prescribed 284,475 dosage units of controlled substances. During this period, the most common illegally prescribed drugs were Oxycodone, Alprazolam aka Xanax, and Carisoprodol aka Soma, the "Las Vegas Cocktail." Wetselaar continued to follow his pattern of selling illegally prescribed drugs.[35]

34. "Beginning in 2008, and continuing on or about August 30, 2010," Wetselaar and Litwin knowingly conspired and agreed to distribute Oxycodone and Hydrocodone illegally.[36]

35. Wetselaar paid Litwin: $3,000 a month from August 2009 through April 2017 with illegal proceeds, totaling $276,000 (92 months x $3,000).[37] Wetselaar wrote checks to Litwin on his Wells Fargo Bank Account that had the illegal proceeds from his and

---

[33] Exs. E, Search Warrant Inventory List of Deposit Box 1023 of 24/7 Private Vault; E-1, U.S. Currency; E-2 Precious Metals.
[34] Ex. A; Ex. B; Ex. C; FTE ECF No. 486, Exs. 30, American Coin Express Business Records, 31A, 31B, 36B, Summary Chart Cash deposits; 39B, Expert's Report Chart of out of town while prescribing; 48, Bank Statement Composite; ASTE, ECF No. 910, Exs. 29, 32A, 32B, 33A, 33B, 34A, 34B, 36A, Summary Charts of Aggregated Cash Deposits; 39A, Expert's Report colored charts; 46, Photographs; 47, Photographs; composite exhibit of photographs.
[35] Ex. A:12.
[36] Litwin's Presentence Investigation Report (PSR):6, ¶12, ¶13-49, revised August 24, 2017.
[37] Litwin's PSR:6-13, ¶ 12-49, and 19 ¶103.

Litwin's illegally prescribing of drugs. Litwin endorsed the checks over to Wetselaar at the Nevada State Bank that had the illegal proceeds from his and Litwin's illegally prescribing drug. Wetselaar cashed the checks and gave the cash to Litwin.[38]

36. From August 6, 2008, through July 27, 2010, Wetselaar paid Litwin $89,718 from Wetselaar's illegal proceeds through his and Litwin's illegally prescribing drugs.[39]

37. In Wetselaar's and Litwin's joint motion to suppress the search warrants and to return property, Litwin claimed he owned, and Wetselaar agreed Litwin owned, the assets in 24/7 Vault Nos. 4010 and 1023.[40] At Litwin's first forfeiture hearing he claimed $99,900 and 53 1 Ounce gold coins from 24/7 Vault Nos. 4010 and 1023. This Court found and held Litwin owned $99,900 and 53 1 Ounce gold coins.[41]

38. The government incorporates the facts in Litwin's Presentence Investigation Report (PSR) as relevant and reliable evidence that support Litwin's forfeitures.[42] This Court may adopt as relevant and reliable evidence the unchallenged PSR facts and the PSR facts that were challenged where this Court overruled the objections to the facts.[43]

---

[38] ASTE Exs. 32A, 32B, 33A, 33B. Ex. A, B, C.

[39] Defendant's Exhibit 778, IRS-CI Robert Norris's calculation of illegal proceeds payments from Wetselaar to Litwin August 6, 2008, through July 27, 2010.

[40] Wetselaar's and Litwin's Motion to Suppress Evidence, ECF No. 65:5, 7, 9, 13, 20; Ex. B:6-8; Ex. C:3-6.

[41] Litwin Forfeiture Hearing, ECF No. 744: 20-22.

[42] Litwin PSR: 6-13, ¶12-49, revised August 24, 2017; incorporated herein by reference as if fully set forth herein; LR IA 10-3(a).

[43] "The court's [forfeiture] determination may be based on evidence already in the record… and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B) (brackets and ellipsis added); U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."); *United States v. Huckins*, 53 F.3d 276, 279 (9th Cir. 1995) (Hearsay evidence may be used at sentencing where "some minimal indicia of reliability accompany a hearsay statement.") (citation and quotation marks omitted) (quoting *United States v. Petty*, 982 F.2d 1365, 1369, *amended*, 992 F.2d 1015 (9th Cir. 1993)); *see United States v. Flores*, 725 F.3d 1028, 1038 (9th Cir. 2013); *United States v. Alvarado–Martinez*, 556 F.3d 732, 736 (9th Cir. 2009); *United States v. Romero-Rendon*, 220 F.3d 1159, 1161-62 (9th Cir. 2000); *United States v. Columbus*, 881 F.2d 785 (9th Cir. 1989); *United States v. Fernandez–Cabrera*, 625 F.3d 48, 54 (1st Cir. 2010) ("The defendant interposed no objection to the chronicling of these events, and it is settled beyond hope of contradiction that unobjected-to '[f]acts contained in a presentence report ordinarily are considered reliable evidence for sentencing purposes.'") *(quoting United States v. Morillo*, 8 F.3d 864, 872–73 (1st Cir. 1993), *superseded in part on other grounds*; *see also United States v. Velazquez*, 777 F.3d 91, 93 (1st Cir. 2015) (the relevant and reliable facts came from the transcript and un-objected to portions of the PSR).

39. The government incorporates the facts and all testimony in Wetselaar's and Litwin's original trial and Litwin's second trial, exhibits of both trials, and additional exhibits provided with this Stipulation. All support the preliminary forfeiture order of U.S. $99,900; 53 1 Ounce gold coins; and a criminal forfeiture money judgment of $89,718 as to Litwin since Wetselaar paid him with illegal proceeds that both Litwin and Wetselaar received for prescribing drugs illegally.[44]

40. David A. Litwin knowingly and voluntarily understands and agrees to the civil judicial forfeiture or the criminal forfeiture:

      (a)    a criminal forfeiture money judgment of $89,718 for the illegal proceeds Westselaar wrote to, and cashed the checks for, Litwin;

      (b)    U.S. $99,900 cash; and

      (c)    53 1 Ounce gold coins Wetselaar gave to Litwin from illegal proceeds (the property).

41. David A. Litwin knowingly and voluntarily understands and agrees to forfeit the property to the United States.

42. David A. Litwin knowingly and voluntarily understands and agrees the Unites States will recover the criminal forfeiture money judgment of $89,718 from him.

43. David A. Litwin knowingly and voluntarily understands and agrees the U.S. $99,900 and 53 1 Ounce gold coins will not be applied to the criminal forfeiture money judgment of $89,718.

44. David A. Litwin knowingly and voluntarily understands and agrees to relinquish all possessory rights, ownership rights, and all rights, titles, and interests in the property.

45. David A. Litwin knowingly and voluntarily relinquishes all possessory rights, ownership rights, and all rights, titles, and interests in the property.

46. David A. Litwin knowingly and voluntarily understands and agrees to the district court imposing the civil judicial forfeiture and the criminal forfeiture of the property.

---

[44] All Exhibits listed in the first trial Exhibit List, filed March 23, 2017, ECF No. 486; all Exhibits listed in the second trial Exhibit List, filed September 22, 2023, ECF No. 910; Trial Transcripts of the first trial and second trial; WFT, ECF No. 582, p. 13-22, 24, 29, 34-40; LFT, ECF No. 744, p. 3-9; 10-11, 12, 17-23; LR IA 10-3(a).

47. David A. Litwin knowingly and voluntarily understands and agrees to waive his right to any civil judicial forfeiture proceedings, any criminal forfeiture proceedings, and any forfeiture proceedings (all of which constitutes proceedings) of the property.

48. David A. Litwin knowingly and voluntarily understands and agrees to waive service of process of any and all documents filed in this action or any proceedings concerning the forfeiture of the property arising from the facts and circumstances of this case.

49. David A. Litwin knowingly and voluntarily understands and agrees to waive any further notice to him, his agents, or his attorneys regarding the forfeiture and disposition of the property.

49. David A. Litwin knowingly and voluntarily understands and agrees not to file any claim, answer, petition, or other documents in any proceedings concerning the property; agrees not to contest the forfeiture; agrees not to assist any other person and entity to contest the forfeiture; and agrees to withdraw any claims, answers, counterclaims, petitions, or other documents he filed in any proceedings concerning the property.

50. David A. Litwin knowingly and voluntarily understands and waives all constitutional, statutory, legal, equitable rights, defenses, and claims including, but not limited to, the seizure and forfeiture of the property in any proceedings under the Fourth Amendment to the United States Constitution.

51. David A. Litwin knowingly and voluntarily understands and waives the statute of limitations, the CAFRA requirements, Fed. R. Crim. P. 7, 11, 32.2, and 43(a), including, but not limited to, forfeiture notice in the charging document, the court advising defendant of the forfeiture at the change of plea, the court having a forfeiture hearing, the court making factual findings regarding the forfeiture, the court announcing the forfeiture at the change of plea and the sentencing, the court attaching the forfeiture order to the Judgment in a Criminal Case, the substitution and forfeiture of defendant's other assets, and any and all constitutional, statutory, legal, equitable rights, defenses, and claims regarding the in personam criminal forfeiture money judgment and the substitution and forfeiture of

defendant's other assets in any proceedings, including, but not limited to, double jeopardy and due process under the Fifth Amendment to the United States Constitution.

52. David A. Litwin knowingly and voluntarily understands and waives any and all constitutional, statutory, legal, equitable rights, defenses, and claims regarding the property including, but not limited to, the in personam criminal forfeiture money judgment and the substitution and forfeiture of defendant's other assets in any proceedings, a speedy and public trial by an impartial jury of the State and district wherein the crime was committed, be informed, confront the witnesses against him, under the Sixth Amendment to the United States Constitution.

53. David A. Litwin knowingly and voluntarily understands and waives any and all constitutional, statutory, legal, equitable rights, defenses, and claims regarding the property in any proceedings, including, but not limited to, Excessive Fines Clause and the Cruel and Unusual Punishments Clause under the Eighth Amendment to the United States Constitution.

54. David A. Litwin knowingly and voluntarily understands and waives any and all constitutional, statutory, legal, equitable rights, defenses, and claims regarding the property, the in personam criminal forfeiture money judgment, and the substitution and forfeiture of defendant's other assets in any proceedings under *Honeycutt v. United States*, 581 U.S. 443 (2017); *United States v. Thompson*, 990 F.3d 680 (9th Cir. 2021); *United States v. Prasad*, 18 F.4th 313 (9th Cir. 2021); *United States v. Lo,* 839 F.3d 777, 790-91 (9th Cir. 2016).

55. David A. Litwin knowingly and voluntarily understands and agrees to the entry of the Preliminary Forfeiture Order and the Final Forfeiture Order concerning the property, the in personam criminal forfeiture money judgment and the substitution and forfeiture of other assets to the United States.

56. David A. Litwin knowingly and voluntarily understands and waives the right to appeal any Forfeiture Order but does not waive his right to appeal his conviction, sentence, and judgment that includes the forfeiture under Ninth Circuit forfeiture cases and statutes. If his conviction, sentence, and judgment is upheld, he will not contest the Forfeiture Order.

57. David A. Litwin knowingly and voluntarily understands and agrees the U.S. $99,900 and 53 1 Ounce gold coins are subject to immediate forfeiture to the United States.

58. David A. Litwin knowingly and voluntarily understands and agrees the in personam criminal forfeiture money judgment is immediately due and payable and is subject to immediate collection by the United States Attorney's Office.

59. David A. Litwin knowingly and voluntarily understands and agrees the property, the in personam criminal forfeiture money judgment, and the substitution and forfeiture of defendant's other assets to satisfy the money judgment shall not be treated as satisfaction of any assessment, fine, restitution, cost of imprisonment, and any other penalty the district court may impose in addition to forfeiture.

60. David A. Litwin knowingly and voluntarily understands and agrees that on the government's motion, the court may at any time enter an order of forfeiture or amend an existing order of forfeiture to include subsequently located property or substitute property under Fed. R. Crim. P. 32.2(b)(2)(A) and (C) and 32.2(e).

61. David A. Litwin knowingly and voluntarily understands and agrees to take all steps as requested by the United States Attorney's Office for the District of Nevada to pass clear title to the specific forfeited assets: U.S. $99,900 and 53 1 Ounce gold coins, that will not be applied to the criminal forfeiture money judgment of $89,718.

62. David A. Litwin knowingly and voluntarily understands and agrees to take all steps as requested by the United States Attorney's Office for the District of Nevada to pass clear title to assets that will be substituted and be forfeited and applied to the criminal forfeiture money judgment of $89,718 to the United States and to testify truthfully in any judicial forfeiture proceedings.

63. David A. Litwin knowingly and voluntarily understands, agrees, and acknowledges the in personam criminal forfeiture money judgment amount represents illegal proceeds he and Wetselaar obtained from their participation in selling prescription drugs illegally and received from Wetselaar as payments for David A. Litwin's participation and is forfeitable.

64. David A. Litwin knowingly and voluntarily understands and agrees he shall provide the United States Attorney's Office for the District of Nevada with a full and complete

financial disclosure statement under penalty of perjury within 10 days of executing this stipulation. The financial statement shall disclose to the United States Attorney's Office for the District of Nevada all assets and financial interests valued at more than $500.

65. David A. Litwin knowingly and voluntarily understands and agrees these assets and financial interests include all assets and financial interests he has an interest, direct or indirect, whether held in his name or in the name of another, in any property, real or personal.

66. David A. Litwin knowingly and voluntarily understands and agrees he shall also identify all assets valued at more than $500 which he has transferred to third parties or diverted from him directly to third parties, since August 8, 2008, to the present, including the location of the assets and the identity of any third party

67. David A. Litwin knowingly and voluntarily understands and agrees to the conditions set forth in this Stipulation for Entry of Preliminary Forfeiture Order of U.S. $99,900; 53 1 Ounce gold coins; and a Criminal Forfeiture Money Judgment of $89,718; and Order (Stipulation).

68. David A. Litwin knowingly and voluntarily agrees to hold harmless the United States, the United States Department of Justice, the United States Attorney's Office for the District of Nevada, the Department of the United States Treasury, the Internal Revenue Service-Criminal Investigation, the United States Drug Enforcement Administration, their agencies, their agents, and their employees from any claim made by David A. Litwin or any third party, including but not limited to Wetselaar's estate and his wife claiming all of the assets were Wetselaar's and not David A Litwin, arising from the facts and circumstances of this case, including, but not limited to, David A. Litwin's claim he allegedly owned everything in 24/7 Vault boxes 1040 and 1023 that were ordered returned to Wetselaar's estate after he died on appeal; and Wetselaar's estate and wife claiming everything including the U.S. $99,900; 53 1 Ounce gold coins; and the criminal forfeiture money judgment of $89,718, that is based on what Wetselaar gave to David A. Litwin, that this Court found forfeitable against David A. Litwin after the first trial.

/ / /

69. David A. Litwin knowingly and voluntarily understands, releases and, forever discharges the United States, the United States Department of Justice, the United States Attorney's Office for the District of Nevada, the Department of the United States Treasury, the Internal Revenue Service-Criminal Investigation, the United States the Drug Enforcement Administration, their agencies, their agents, and their employees from any and all claims, rights, or causes of action of any kind that David A. Litwin now has or may hereafter have on account of, or in any way growing out of, the seizures and the forfeitures of the property in the civil administrative forfeitures, the civil judicial forfeitures, and the criminal forfeitures related to this case.

70. Each party acknowledges and warrants that its execution of the Stipulation is free and is voluntary.

71. This Stipulation contains the entire agreement between the parties.

72. Except as expressly stated in this Stipulation, no party, officer, agent, employee, representative, or attorney has made any statement or representation to any other party, person, or entity regarding any fact relied upon in entering into this Stipulation, and no party, officer, agent, employee, representative, or attorney relies on such statement or representation in executing this Stipulation.

73. The persons signing this Stipulation warrant and represent that they have full authority to execute this Stipulation and to bind the persons and/or entities, on whose behalf they are signing, to the terms of this Stipulation.

74. This Stipulation shall be construed and interpreted according to federal forfeiture law and federal common law. The jurisdiction and the venue for any dispute related to, and/or arising from, this Stipulation is the unofficial Southern Division of the United States District Court for the District of Nevada, located in Las Vegas, Nevada.

75. Each party shall bear his or its own attorneys' fees, expenses, interest, and costs.

76. This Stipulation shall not be construed more strictly against one party than against the other merely by virtue of the fact that it may have been prepared primarily by

/ / / /

1  counsel for one of the parties; it being recognized that both parties have contributed

2  substantially and materially to the preparation of this Stipulation.

3         IT IS HEREBY CERTIFIED, under 28 U.S.C. § 2465(a)(2), that there was

4  reasonable cause for the seizure and forfeiture of the property.

5  DATED: _10 - 16 - 25_          DATED: _____

6  MCLETCHIE LAW                    SUE FAHAMI
                                    Executive Assistant United States Attorney
7

8

9  LISA RASMUSSEN                   DANIEL D. HOLLINGSWORTH,
   Counsel for David A. Litwin      Assistant United States Attorney,

10 DATED: _10 - 16 - 2025_

11

12

13 DAVID A. LITWIN,
   Defendant,

14

15

16                                  IT IS SO ORDERED:

17

18

19

20                                  KENT J. DAWSON
                                    UNITED STATES DISTRICT JUDGE

21
                                    DATED: ___November 12, 2025___
22

23

24

25

26

27

28

counsel for one of the parties; it being recognized that both parties have contributed substantially and materially to the preparation of this Stipulation.

IT IS HEREBY CERTIFIED, under 28 U.S.C. § 2465(a)(2), that there was reasonable cause for the seizure and forfeiture of the property.

DATED: _____

MCLETCHIE LAW

_____
LISA RASMUSSEN
Counsel for David A. Litwin

DATED: _____

_____
DAVID A. LITWIN,
Defendant,

DATED: October 17, 2025

SUE FAHAMI
Executive Assistant United States Attorney

 /s/ Daniel D. Hollingsworth
_____
DANIEL D. HOLLINGSWORTH,
Assistant United States Attorney,

IT IS SO ORDERED:

_____
KENT J. DAWSON
UNITED STATES DISTRICT JUDGE

DATED: ___November 12, 2025___

SUE FAHAMI
Executive Assistant United States Attorney
District of Nevada
Nevada Bar No. 5634
DANIEL D. HOLLINGSWORTH
Assistant United States Attorney
Nevada Bar No. 1925
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Tel: (702) 388-6336
Fax: (702) 388-6787
Daniel.Hollingsworth@usdoj.gov
*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:11-CR-347-KJD-MDC |
| Plaintiff, | **Index of Exhibits** |
| v. | |
| DAVID A. LITWIN, | |
| Defendant. | |

Exhibit A ........................................... Affidavit of IRS-CI SA Robert Norris for a criminal

search warrant of Bank Accounts issued on October 3, 2011

Exhibit B.......... Affidavit of IRS-CI SA Robert Norris for a criminal search warrant of Safe

Deposit Boxes 4010, 4025, and 1656 at 24/7 Private Vaults issued on October 3, 2011

Exhibit C ......... Affidavit of IRS-CI SA Robert Norris for a criminal search warrant of Safe

Deposit 1023 at 24/7 Private Vaults issued on October 5, 2011

Exhibit D .......... Search Warrant Inventory List of Deposit Box 4010 of 24/7 Private Vault

Exhibit D-1 ......................................................................... U.S. Currency

Exhibit D-2 ...................................................................... Foreign Currency

Exhibit D-3 ........................................................................ Precious Metals

Exhibit E........... Search Warrant Inventory List of Deposit Box 1023 of 24/7 Private Vault

Exhibit E-1 ......................................................................... U.S. Currency

Exhibit E-2 ........................................................................ Precious Metals

Exhibit A - Affidavit of IRS-CI SA Robert Norris for a criminal search warrant of Bank Accounts issued on October 3, 2011

Exhibit A - Affidavit of IRS-CI SA Robert Norris for a criminal search warrant of Bank Accounts issued on October 3, 2011

2

1    ### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT

2    I, Special Agent ROBERT NORRIS (your Affiant), being duly sworn, do hereby state as

3    follows:

4    ### INTRODUCTION AND EXPERIENCE OF AGENT

5    1.    Your Affiant is a Special Agent ("SA") with Internal Revenue Service-Criminal

6    Investigation ("IRS-CI") and has been so employed since September 2008. Your Affiant possesses a

7    bachelor's degree in accounting and has received extensive training in financial investigative

8    techniques. He is currently assigned to the Organized Crime Drug Enforcement Task Force

9    ("OCDETF") and the High Intensity Drug Trafficking Area Task Force ("HIDTA") at the Las Vegas

10    Office of the Drug Enforcement Administration ("DEA") and has been since April 2010. He has

11    conducted numerous investigations relating to violations of the internal revenue laws (Title 26,

12    United States Code), the Bank Secrecy Act (Title 31, United States Code), money laundering

13    statutes (Title 18, United States Code, Section 1956, 1957), and related offenses perpetrated against

14    the United States Government.

15    2.    Your Affiant has received training and has collaborated with other law enforcement

16    agencies concerning investigations involving the unlawful possession and distribution of controlled

17    substances, and is familiar with Federal laws involving their illegal purchase, distribution, and

18    possession.

19    3.    As assigned to the DEA, your Affiant has become familiar with the manner in which

20    controlled substances are acquired and distributed within the licit and illicit market, the methods of

21    payment for such controlled substances, the efforts involved in such activity to avoid detection by

22    law enforcement, and the methods used by pharmaceutical controlled substance diverters to conceal

23    the nature of their illegal activity.

24    4.    Your Affiant is presently involved in an ongoing criminal investigation of Dr. Henri

1

1    Wetselaar (hereinafter "Wetselaar") regarding violations of Federal drug trafficking, money

2    laundering, and bank secrecy laws. This investigation is ongoing and your Affiant is being assisted

3    by the DEA and the other local police departments.

4         5.    Based on my training and experience in conducting financial investigations, your

5    Affiant is familiar with the methods and practices used by individuals and organizations involved in

6    financial crimes and illicit activities such as drug trafficking that generate large amounts of income.

7    These methods include cash purchases, the use of aliases and nominees, the use of businesses as

8    "fronts" in an attempt to legitimize and conceal their activities, and the structuring of financial

9    transactions in a manner to avoid Federal reporting requirements by financial institutions. Your

10   Affiant has experience in debriefing defendants, participant witnesses, informants, and other persons

11   who have had personal experience and knowledge of amassing, spending, converting, transporting,

12   distributing, and concealing profits from illegal activities.

13        6.    Unless stated otherwise, your Affiant has personal knowledge of the matters set out in

14   this affidavit. To the extent that any information in this affidavit is not within your Affiant's

15   personal knowledge, it was made known to your Affiant through my own review of records provided

16   by financial institutions and interviews of witnesses, and through reliable law enforcement sources,

17   including discussions with other law enforcement agents, which causes me to believe the

18   information to be true.

19                          **ITEMS TO BE SEIZED**

20        5.    This affidavit is made in support of an application for a seizure warrant to seize the

21   following assets:

22             a.    Any and all funds held at Wells Fargo, 530 Las Vegas Blvd South, Las Vegas,

23   NV, 89101, in bank account # 1070039402 in the name Henri Wetselaar;

24             b.    Any and all funds held at JP Morgan Chase Bank, 2865 East Charleston Blvd,

Las Vegas, NV 89104, in bank account # 3152283079 in the name Henri Wetselaar d/b/a

NEW AMSTERDAM MEDICAL GROUP;

      c.     Any and all funds held at Nevada State Bank, 4970 East Tropicana Avenue,

Las Vegas, NV 89121, in bank account # 100063353 in the name Henri Wetselaar;

      d.     Any and all U.S. Currency or gold krugerrands held at Nevada State Bank,

4970 East Tropicana Avenue, Las Vegas, NV 89121, in safe deposit box # FSO741, 50741-2

in the name of Henri and Bing Wetselaar;

      e.     Any and all cash, deposits, money market funds, bonds, stocks, mutual funds,

and partnerships held at Edward D. Jones, 1000 N Green Valley Parkway, Suite 500,

Henderson, NV 89074, in trading account # 441-05297-1-5 in the name Henri Wetselaar.

6.     There is probable cause to believe that the assets listed above:

      a.     are proceeds traceable to exchanges of controlled substances in violations of

21 §§ U.S.C. 841 and 846, are subject to seizure pursuant to 21 U.S.C § 881(b) and 18

U.S.C. § 981(b), and are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6);

      b.     are used or intended to be used to facilitate violations of 21 U.S.C. §§ 841 and

846, are subject to seizure pursuant to 21 U.S.C. § 881(b) and 18 U.S.C. § 981(b), and are

subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6);

      c.     are involved in transactions or attempted transactions in violations of 18

U.S.C. § 1956 or property traceable to such property, are subject to seizure pursuant to 18

U.S.C. § 981(b), and are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1); and

      d.     are involved in transactions or attempted transactions in violations of 18

U.S.C. § 1957 or property traceable to such property, are subject to seizure pursuant to 18

U.S.C. § 981(b), and are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1).

      e.     are involved in violations of 31 U.S.C. § 5324, or a conspiracy to commit

3

such violations, are subject to seizure pursuant to 18 U.S.C. § 981(b), and are subject to

forfeiture pursuant to 31 U.S.C. § 5317(c)(2);

      f.     are property traceable to violations of 31 U.S.C. § 5324, or a conspiracy to

commit such violations, is subject to seizure pursuant to 18 U.S.C. § 981(b), and are subject

to forfeiture pursuant to 31 U.S.C. § 5317(c)(2);

      g.     are involved in violations of 31 U.S.C. § 5313, or a conspiracy to commit

such violations, are subject to seizure pursuant to 18 U.S.C. § 981(b), and are subject to

forfeiture pursuant to 31 U.S.C. § 5317(c)(2); and

      h.     are property traceable to violations of 31 U.S.C. § 5313, or a conspiracy to

commit such violations, are subject to seizure pursuant to 18 U.S.C. § 981(b), and are subject

to forfeiture pursuant to 31 U.S.C. § 5317(c)(2).

## SUMMARY OF INVESTIGATION

This affidavit is made in support of an application for a seizure warrant for the

abovementioned accounts.  Based on the information set forth below, your Affiant has probable

cause to believe the accounts are related to or contain evidence of the following offenses:

a.  18 U.S.C. § 1956, money laundering;

b.  18 U.S.C. § 1957, transactions in criminal proceeds over $10,000;

c.  31 U.S.C. § 5324, structuring of transactions to avoid currency reporting requirements; and

d.  31 U.S.C. § 5313, relating to causing a financial institution to file a false currency report.

## FACTS ESTABLISHING PROBABLE CAUSE

### I.  BACKGROUND INVESTIGATION

The LVDO has been conducting a pharmaceutical diversion investigation of Las Vegas

physician, Dr. Wetselaar and David A. Litwin (hereinafter "Litwin"), who portrays himself as

Wetselaar's "medical assistant."  Wetselaar is an eighty-seven (87) year old white male who has

1    been licensed by the Nevada State Board of Medical Examiners to practice medicine in this state

2    since 1977.

3    　　　The Wetselaar investigation began on February 16, 2010, when TFO Kendra Still of the

4    DEA Tactical Diversion Squad, was contacted by Nevada Board of Pharmacy (NVBOP)

5    Investigator Daniel Garcia ("Inv. Garcia"). Inv. Garcia informed TFO Still that he had received

6    reports from a local pharmacist that the pharmacist had been approached by Wetselaar and a white

7    male adult, later identified as Litwin, who asked the pharmacist to allow Wetselaar to write

8    prescriptions in the parking lot of the pharmacy on Saturdays.  The pharmacist, who wished to

9    remain anonymous, stated that Litwin instructed the pharmacist that if he filled the prescriptions that

10    Wetselaar wrote without asking any questions, in return Wetselaar would provide the pharmacist

11    with a "kickback."

12    　　　After learning this information, law enforcement began an investigation into Wetselaar's

13    business practices.  As part of the investigation, law enforcement agents acting in an undercover

14    capacity, went to Wetselaar's business, the New Amsterdam Medical Group (NAMG), located at

15    4525 S. Sandhill Avenue, Suite 107, Las Vegas, Nevada.

16    　　　A.　　**Undercover Investigation**

17    　　　Specifically, on April 6, 2010, TFO Steven Armbruster, acting in an undercover capacity

18    went to the NAMG and observed a female, later identified as Melissa Salaices, escorting patients

19    between the waiting and examination rooms in the NAMG offices.

20    　　　On April 27, 2010, TFO Holly Chadwick ("TFO Chadwick") of the DEA Tactical Diversion

21    Squad was acting in an undercover capacity for an unrelated investigation and contacted Lam's

22    Pharmacy. While acting in this role, TFO Chadwick's asked the pharmacy employee for the name of

23    a doctor in town who would be willing to see her without insurance and one where she would not

24    have a long wait.  The employee contacted the pharmacist who then provided Wetselaar's name and

1  phone number along with the number of three other doctors.  On April 28, 2010, TFO Chadwick

2  contacted Wetselaar's office and made an appointment.

3        On April 6, May 4, June 1, and June 29, 2010, TFO Armbruster, while working in an

4  undercover capacity, went to Wetselaar's medical office at 4525 S. Sandhill, Suite 107, Las Vegas,

5  Nevada, 89121.  During all four appointments TFO Armbruster was prescribed controlled

6  substances for pain. Only on the first appointment did a physician's assistant even appear to look at

7  TFO Armbruster's purported pain but did not manipulate or touch the area.  Wetselaar did not

8  examine the area.  Also, on one visit, TFO Armbruster asked for a higher level of pain medication

9  but was refused by the physician's assistant who told him that the doctor's visit fee for a more potent

10  controlled substance is $300 not the $200 TFO Armbruster had been paying.

11        On June 1, 2010 and July 2, 2010, TFO Chadwick, while working in an undercover capacity,

12  went to Wetselaar's medical office at 4525 S. Sandhill, Suite 107, Las Vegas, Nevada, 89121 for

13  scheduled appointments.  During both appointments, TFO Chadwick was prescribed a controlled

14  substance for pain medication, a second for a muscle relaxant, and a third as an anti-depressant.

15  During the appointment, Wetselaar never physically examined or manipulated TFO Chadwick's

16  purported pain, never referred her to a specialist for further diagnoses of the symptomatic problem,

17  nor did he refer her to a specialist for a diagnostic test, an x-ray, or an MRI.  TFO Chadwick paid

18  $200 cash for both exams.

19        On July 6, 2010, TFO Armbruster, while acting in an undercover capacity, met with Melissa

20  Salaices to purchase controlled substances.  During that drug transaction, Salaices advised TFO

21  Armbruster that knew of at least 200 clients that she and another female named Carolyn Allen would

22  bring to Wetselaar to obtain prescriptions.  Salaices further explained how she and Carolyn Allen

23  would collect the prescriptions from the recruited patients, fill the prescriptions, and subsequently

24  sell the prescription narcotics on the street for a profit.

B.    Analysis of Wetselaar's Prescribing Practices

On June 5, 2010, DEA TFO Kendra Still performed an analysis of Wetselaar's prescribing habits. In order to make a fair and impartial comparison a second doctor's practice meeting the similar characteristics to NAMG was selected. That comparison demonstrated that Dr. Wetselaar is prescribing a substantially higher number of controlled substances, more specifically pain medications, anti-depressants, and muscle relaxers than a typical practice that would be similar to his practice. Based on TFO Still's training and experience, these types of controlled substances are frequently diverted for illegal use and/or distribution.

Additionally, DEA TFO Kendra Still reviewed Wetselaar's DEA file on August 19, 2010 and determined that he was first registered by the DEA as a Medical Physician to prescribe controlled substances in Schedule II through V in 1986. A database search and inquiries with various licensing boards in Nevada revealed that Litwin has no known medical credentials.

Also on August 19, 2010, DEA TFO Kendra Still examined the Clark County Business Licensing website, located at www.co.clark.nv.com. Among other information, the website indicates that Wetselaar is the business owner of New Amsterdam Medical Group (NAMG). NAMG is a domestic professional corporation and has been in business in Las Vegas since July 11, 2007.

C.    Execution of the Search Warrant at New Amsterdam Medical Group

On August 31, 2010, TFO Still along with fellow law enforcement personnel executed a Federal search warrant of Dr. Wetselaar's medical office, NAMG, located at 4525 South Sandhill Ave, Suites 102, 105, and 107 in Las Vegas, NV 89121. During the execution of the search warrant, DEA personnel located a plastic accordion file that held multiple cash payments that were secured with a paperclip and included patient names.

Also during the search of Suite 102 at the above location, law enforcement personnel

uncovered multiple torn-up lists in a garbage can. The lists documented patient visitations. The discarded visitation lists included individual names with dollar amounts listed next to the names as if to be associated with each name. The dollar amounts appeared to be amounts of money paid by each of the patients.

### D.    Statements made by Dr. Henri Wetselaar

On August 31, 2010, TFO Kendra Still and TFO Richard Wallace and Intel Analyst Yelena Faler interviewed Dr. Wetselaar. Dr. Wetselaar was not in custody. He consented to the interview and stated the following:

i.      He began practicing at the Sandhill location in late 2009, after making house calls became cumbersome and less feasible from a financial perspective. Dr. Wetselaar stated that he opened the office, known as New Amsterdam Medical Group, to try to rebuild after suffering significant financial loss a couple years before. Dr. Wetselaar informed your Affiant that his practice is a concierge practice. It is a cash only business, although Dr. Wetselaar will accept Medicare and Medicaid patients as well. Dr. Wetselaar stated that on a typical day, he sees approximately 10-15 patients. He said the most patients he has seen in a day is around 25-30 patients. Dr. Wetselaar stated that an office visit costs between $200 and $300. An office visit resulting in a prescription for Lortab or Percocet would fall in the in the $200 price range. A visit resulting in a prescription for Oxycontin or oxycodone would cost $300. When a patient paid for the visit, he or she would hand the money to Dr. Wetselaar's medical assistant, David Litwin ("Litwin"). Dr. Wetselaar explained he had patients do this because he felt this is more "elegant." Litwin would give the money to Dr. Wetselaar at the end of the day. Dr. Wetselaar said he made approximately three or four bank deposits a week.

ii.     When asked about his banks accounts, Dr. Wetselaar stated that he has a separate bank account for his business. Your Affiant questioned Dr. Wetselaar about his habits when making deposits at the bank. Dr. Wetselaar stated that he purposely makes deposits of less than $10,000 in

8

order to circumvent bank reporting requirements. Dr. Wetselaar stated that he did not want to have

to fill out the paperwork.

### E.    Summary of Witness Statements

On September 30, 2010, Heidi Hoffbauer was proffered by TFO Kendra Still, AUSA Crane

Pomerantz, AUSA Pat Walsh, TFO Richard Wallace, FBI SA Robert Erickson, and Intel Analyst

Yelena Faler. Hoffbauer was not in custody. She consented to the interview and stated the following:

i.    Hoffbauer stated that she began working for Dr. Wetselaar as a receptionist around

July of 2009. Hoffbauer stated that approximately 90 percent of Dr. Wetselaar's patients paid in

cash. Hoffabauer stated that the remaining 10 percent used insurance (Medicare/Medicaid). The

insurance patients tended to be patients for whom Dr. Wetselaar made home visits prior to January

2010. Hoffbauer also said that when patients paid in cash a dot would be placed in their patient file

to denote and differentiate cash and insurance paying patients. Cash patients also tended to be

patients that would come to the office in groups. Hoffbauer stated that these groups of patients were

frequently brought in by people such as Carolyn Allen, Jason Kutz and Melissa Salaices.

ii.    Hoffbauer stated that Allen, the most prolific of the people bringing in groups, would

bring approximately eight to fifteen people with her during her appointed time with Dr. Wetselaar.

However, if Allen did not come with the group, Melissa Salaices would take Allen's place.

Hoffbauer stated the Allen's behavior was "odd." Allen would give Dr. Wetselaar a slip of paper

that included the patient's name and current medications. This slip would be given to the doctor

before the exam. Also, Hoffbauer found it odd that Allen paid Dr. Wetselaar for all the patient visits.

Allen would enter the exam room after the last exam for her group and would make one cash

payment to Dr. Wetselaar. Hoffbauer remembers observing Allen hand cash directly to Dr.

Wetselaar.

iii.    Hoffbauer also said that Allen received special pricing for the office visits. A normal office visit to Dr. Wetselaar would cost $300. The price increased to $400 if the patient received a prescription for Oxycontin. According to Hoffbauer, Allen only paid $200 per exam.

iv.    Hoffbauer stated that Dr. Wetselaar was in charge of all of the money. She did not know if he kept track of the money in a ledger or logbook of some kind. Aleah Fan, Dr. Wetselaar's daughter in law and receptionist, told Hoffbauer that Dr. Wetselaar did not report his earnings. Hoffbauer did not have a safe in the office, and he took cash home with him every day. However, sometimes Dr. Wetselaar would buy Krugerrands, which Hoffbauer said he "loved." Hoffbauer stated that a representative from Coin Express would come to the office to sell Dr. Wetselaar the Krugerrands.

v.    On October 25, 2010, TFO Kendra Still proffered Jason Kutz, a known associate of Dr. Henri Dr. Wetselaar. Also present during the proffer were AUSA's Pomerantz, TFO Richard Wallace and FBI S/A's Robert Erickson and Andrew Attridge, as well as DEA Diversion Investigator Cynthia Hooks. Kutz was in custody. He consented to the interview and stated the following:

vi.    Approximately seven months prior to his arrest, Kutz met with Dr. Wetselaar and Litwin in the back of Dr. Wetselaar's Lincoln car at a local Jack in the Box restaurant. According to Kutz, he was introduced to Dr. Wetselaar and Litwin by a female named "Sherrie" LNU on the first visit. She was also in the in rear of the Lincoln with Kutz. Kutz stated that during this visit they all discussed Kutz giving Dr. Wetselaar $300 in cash to write prescriptions for each person that Kutz brought to Dr. Wetselaar. In return, it was agreed that each patient of Kutz's would receive prescriptions for 180-260 Roxicodone pills, and 60-90 Xanax pills. It was also mentioned that Kutz would receive150 pills of 80 milligram "Oxy's" (Oxycontin) pills per month.

vi.    Kutz said that about 80% of the time, he went with 10-15 people to Dr. Wetselaar. Kutz said he would go in first without the patients to confirm the people with Heidi, and then he would pay $300 for each person's visit from his own pocket. For 10 people, Kutz would pay $3000 cash. He said it was easy to have that much cash for the visits because he was making such large amounts of money.

vii.    On December 2, 2010, TFO Kendra Still was present during a proffer of Carolyn Allen, a known associate of Dr. Henri Dr. Wetselaar. Also present during the proffer were AUSA's Crane Pomerantz and Patrick Walsh, TFO Richard Wallace and FBI S/A's Robert Erickson and Andrew Attridge, as well as DEA Intel Analyst Yelena Faler. Allen was in custody. She consented to the interview and stated the following:

viii.    Allen stated that she began having Dr. Wetselaar see her patients at her house approximately 5 years ago. Allen stated that Dr. Wetselaar and Litwin would come to her home and would write prescriptions for her clients, at which she had approximately 50 patients that would get prescriptions for Lortab and/or Xanax or Lortab and Soma. Eventually, Dr. Wetselaar began writing prescriptions for oxycodone. Allen stated the eventually she had approximately 150 patients who would see Dr. Wetselaar.

ix.    According to Allen, Dr. Wetselaar and Litwin were very concerned about money. Allen said that Dr. Wetselaar and Litwin asked for approximately $300 per client visit, but Allen refused to pay that much. Dr. Wetselaar and Litwin told Allen that she was receiving a deal, saying that the going rate for a visit to a pain management specialist was about $500-$600, Allen said she agreed to pay Dr. Wetselaar approximately $125- $150 per visit. However, about six to eight weeks prior to the proffer session, Dr. Wetselaar raised the price for his visits.

x.    Allen stated that Dr. Wetselaar only wanted to see ten patients during each visit to Allen's home. Allen said she would pay Dr. Wetselaar a single lump sum after all the patients had

11

1    been seen for the day. She would pay Dr. Wetselaar by either cash or check. Allen said she preferred

2    to pay by check, while Dr. Wetselaar preferred to be paid in cash.

3         F.    **Dr. Wetselaar's current practice**

4              Law enforcement officers have learned that Dr. Henri Wetselaar continues to practice at

5    the New Amsterdam Medical Group (NAMG), and continues to operates a highly cash intensive

6    business.  On September 22, 2011, TFO Wallace, while acting in an undercover capacity, called

7    NAMG and set-up an appointment for 8:30 a.m. on Wednesday, September 28, 2011, confirming

8    that Wetselaar is still seeing patients.  Further, TFO Wallace confirmed that NAMG still accepts

9    cash for visits.  On September 26, 2011, TFO Still observed that NAMG, located at 4525 S. Sandhill

10   Ave., Suite 107, Las Vegas, Nevada is currently open for business.

11        On September 27, 2011, TFO Still reviewed the State of Nevada Drug Monitoring Program

12   database to determine if Wetselaar was still writing prescriptions for controlled substances.   TFO

13   Still determined that from August 31, 2010, to the present, Wetselaar has written 284,475 dosage

14   units of controlled substances.  During that period, the most commonly prescribed substances were

15   that of Oxycodone, Alprazolam (aka Xanax), and Carisoprodol (aka Soma).  Law enforcement

16   officials refer to these three prescriptions, when prescribed together, as the "Las Vegas Cocktail."

17   **II.    FINANCIAL INVESTIGATION**

18        Given the information gathered about Wetselaar, your Affiant reviewed Wetselaar's financial

19   statements and activity for possible violations of the internal revenue laws (Title 26, United States

20   Code), the Bank Secrecy Act (Title 31, United States Code), money laundering statutes (Title 18,

21   United States Code, Sections 1956, 1957), and related offenses perpetrated against the United States

22   Government.

23        As part of my investigation, I reviewed the following accounts:

24        a.    JP Morgan Chase Bank (formerly Washington Mutual Bank) business account

1             #3152283079 in the name of Henri Wetselaar, M.D., P.C. (hereinafter "x3079");

2       b.      Wells Fargo Bank (formerly New Mexico Bank) personal checking account

3             #1070039402 in the name of Henri Wetselaar and Bing Wetselaar, (hereinafter

4             "x9402");

5       c.      Wells Fargo Bank Line of Credit ("LOC") account #654-6831966-1998 (hereinafter

6             "x1998") in the name of Henri Wetselaar;

7       d.      Nevada State Bank personal checking account #100063353 in the name of Henri and

8             Bing Wetselaar, (hereinafter "x3353"); and

9       e.      Edward Jones trading account #441-05297-1-5 (hereinafter "x7-1-5") in the name of

10             Dr. Henri Wetselaar.

11       During the review of Wetselaar's financial activity,  your Affiant was aware that TFO Still

12 had determined that given Wetselaar's business practice, including: 1) the amount he was charging

13 patients, 2) the number of patients he was seeing per day, 3) the particular controlled substances

14 being prescribed, and 4) the differing rates charged to customers based on the controlled substances

15 sought by the patients,  Wetselaar had likely generated approximately $3,600,000 in income between

16 August 2009 to August 2010.   Knowing that his income was overwhelmingly in cash, your Affiant

17 reviewed Wetselaar's cash deposits from August 2008 to August 2010.  Your Affiant's review of

18 bank activity during this time revealed that Wetselaar's personal bank began receiving an increasing

19 amount of cash deposits, while the business account for NAMG showed a reducing the amount of

20 medical insurance reimbursements.

21       Additionally, there were substantial increases in spending activity including the repayment of

22 a line of credit in excess of $135,000, the purchase of a personal residence in the amount of

23 $103,000, and over $495,000 in growth in personal trading accounts.  A comprehensive analysis of

24 many of Wetselaar's financial activites, divided by type of account or transaction(s), are discussed

individually below.

### G.    Line of Credit

Your Affiant conducted a review of Wells Fargo Bank LOC account x1998 in the name of Henri Wetselaar. LOC account x1998 was examined from August 1, 2008 until it was repaid on December 15, 2009. During this time, $110,000 was paid towards the line of credit (LOC). The payments were made in eight (8) lump sums, which were broken down into three (3) payments of $20,000 each, and five (5) individual payments each of $10,000. The balance in August of 2008 in account x1998 was $128,752.11. By December 2009, Wetselaar paid a total of $136,924.09 towards the account including finance and other charges.

### H.    Deposit Analysis

Your Affiant conducted a bank account analysis on three bank accounts at separate domestic financial institutions. Wetselaar had signatory authority of each of the accounts examined and exhibited in this affidavit. The time period for the banking activity that was reviewed is August 1, 2008 to August 31, 2010. The accounts are as follows:

i.    JP Morgan Chase Bank business bank account x3079. Account x3079 was opened on September 26, 2007 by Westelaar and granting him signatory authority over the account. On September 30, 2007, the account was updated to include DBA New Amsterdam Medical Group. The address of record during this time was 282 E Lake Mead Parkway, Henderson, NV 89015. According to an updated signature card, Bing Wetselaar was granted signatory authority on June 9, 2008.

ii.    Wells Fargo Bank personal checking account x9402. Account x9402 was opened by Wetselaar on November 22, 1991, granting him signatory authority over the account. On March 6, 2004, a Wells Fargo document titled "Consumer Account Application for

14

Relationship, Name or Title Change" was signed by Wetselaar granting Bing Wetselaar joint signatory authority.

iii.    Nevada State Bank personal checking account x3353.  Account x3353 was opened on May 22, 1997 by Henri and Bing Westelaar granting them signatory authority over the account.

### a.    Wells Fargo Bank Cash Deposits to x9402

During the time period under review, cash deposits into Wetselaar's personal bank account, x9402, fluctuated.  The following represents cash deposits by month during the review period:

### Table 1: Wells Fargo Bank Monthly Total Cash Deposits to x9402

| 2008 | | 2009 | | 2010 | |
|------|------|------|------|------|------|
| Month | Cash | Month | Cash | Month | Cash |
| | | Jan-09 | $    900.00 | Jan-10 | $    9,000.00 |
| | | Feb-09 | 5,960.00 | Feb-10 | 34,000.00 |
| | | Mar-09 | 8,700.00 | Mar-10 | 58,700.00 |
| | | Apr-09 | 5,500.00 | Apr-10 | 51,000.00 |
| | | May-09 | 3,600.00 | May-10 | 0.00 |
| | | Jun-09 | 12,900.00 | Jun-10 | 47,300.00 |
| | | Jul-09 | 11,900.00 | Jul-10 | 45,900.00 |
| Aug-08 | $    0.00 | Aug-09 | 15,400.00 | Aug-10 | 19,600.00 |
| Sep-08 | 0.00 | Sep-09 | 8,500.00 | | |
| Oct-08 | 0.00 | Oct-09 | 8,800.00 | | |
| Nov-08 | 0.00 | Nov-09 | 10,000.00 | | |
| Dec-08 | 0.00 | Dec-09 | 64,200.00 | | |
| **Total** | **$    0.00** | | **$    156,360.00** | | **$    265,500.00** |

Your Affiant observed a significant increase in cash deposits that began in June 2009,

continiuing through August 2010. The increase in cash deposits directly correlates to the increase in Wetselaar's controlled substances prescriptions. As analyzed by TFO Still, from July 2009 – July 2010 there was also an increase in Wetselaar's controlled substance prescribing practices. Prescriptions increased from 2,899 prescriptions to 10,739, an increase of over 270% from the previous year. As evidenced by the information contained in Table 1 above, prior to 2009, there were no cash deposits into Wetselaar's personal bank account. Then, beginning in January of 2009, and continuing through August of 2010, Wetselaar made large cash deposits, including cash deposits totaling $64,200 (Dec. 2009), $58,000 (March 2010), and $45,900 (July 2009).

Between January 2009 – August 2010, your Affiant identified thirty-three (33) various transactions, indicative of violations of Title 31, United States Code, Sections 5313, and 5324(a) and 5324(c), occurring between June 1, 2009 and August 20, 2010 all below $10,000. Based on Your Affiant's training and experience, conducting numerous cash transactions at amounts below $10,000 indicates knowledge of the currency transaction reporting (CTRs) requirement. Additionally, when an individual makes numerous cash deposits, at or below the $10,000 amount, there is probable cause to believe that that individual is intentionally structuring deposits in amounts to avoid the CTR being filed.

Of the 33 cash deposits your Affiant identified as being below the $10,000 threshold, eighteen (18) were over $8,000. Ten (10) of the deposits were between $7,999 and $5,000. The remaining five (5) were less than $5,000 with the smallest being $2,400. All of the 33 deposits were in amounts rounded to a $100 increment, and totaled $243,400. See EXHIBIT 1. Given your Affiant's training and experience, individuals who are structuring, or attempting to structure, make deposits that are rounded to a $100 increment.

b.    **Daily Cash Deposits Aggregating in Excess of $10,000**

At or around February 19, 2010 and continuing to August 26, 2010, Wetselaar engaged in a

series of financial transactions with Wells Fargo Bank account x9402, Nevada State Bank account x3353, and JP Morgan Chase Bank account x3079. The following summarizes the banking activity:

Your Affiant identified nine (9) occasions when multiple cash deposits on a single day were conducted at differing financial institutions. Each deposit was less than $10,000, but when aggregated for the day exceeded $10,000.

**Table 2: Daily Cash Deposits Aggregating in Excess of $10,000**

| # | DATE | Cash Deposit x9402 | Cash Deposit x3079 | Cash Deposit x3353 | TOTALS |
|---|------|-----------|-----------|-----------|--------|
| 1 | 02/19/2010 | $ 9,000.00 | | $ 9,000.00 | $ 18,000.00 |
| 2 | 02/26/2010 | 9,000.00 | | 7,500.00 | 16,500.00 |
| 3 | 03/01/2010 | 6,700.00 | | 9,000.00 | 15,700.00 |
| 4 | 03/05/2010 | 9,000.00 | | 9,000.00 | 18,000.00 |
| 5 | 03/12/2010 | 9,000.00 | | 9,000.00 | 18,000.00 |
| 6 | 06/18/2010 | 9,000.00 | | 5,500.00 | 14,500.00 |
| 7 | 07/16/2010 | 9,000.00 | $ 9,000.00 | 9,000.00 | 27,000.00 |
| 8 | 07/19/2010 | 9,000.00 | 9,000.00 | 9,000.00 | 27,000.00 |
| 9 | 07/23/2010 | 9,000.00 | | 9,000.00 | 18,000.00 |
| | TOTALS | $ 78,700.00 | $ 18,000.00 | $ 76,000.00 | $ 172,700.00 |

In addition, your Affiant identified four (4) occasions when multiple cash transactions were conducted on a single day involving cash provided by Wetselaar to various financial institutions. These transactions include cash deposits and cash payments for cashier's checks. Each individual transaction was less than $10,000, but when aggregated for the day exceeded $10,000.

**Table 3: Daily Cash Activity Aggregating in Excess of $10,000**

| # | DATE | Cash Deposit x9402 | Cash Purchase of Cashier's Check WELLS FARGO | Cash Deposit x3079 | TOTALS |
|---|------|-----------|-----------|-----------|--------|

17

| # | DATE | | | | TOTALS |
|---|------|--|--|--|--------|
| 10 | 05/10/2010 | | $ 8,000.00 | $ 9,500.00 | $ 17,500.00 |
| 11 | 05/17/2010 | | 9,000.00 | 9,000.00 | 18,000.00 |
| 12 | 05/28/2010 | | 9,000.00 | 8,000.00 | 17,000.00 |
| 13 | 07/26/2010 | $ 9,500.00 | 9,000.00 | | 18,500.00 |
| | TOTALS | $ 9,500.00 | $ 35,000.00 | $ 26,500.00 | $ 71,000.00 |

On seven (7) identified occasions, your Affiant identified multiple cash deposits that were conducted over a series of consecutive banking days. Some of these deposits occurred at the same financial institution, while others were conducted at differing financial institutions. Each of these deposits was less than $10,000 but when aggregated over the consecutive days exceeds $10,000.

**Table 4: Cash Deposits on Consecutive Banking Days Aggregating in Excess of $10,000**

| | DATE | Cash Deposit x9402 | Cash Deposit x3079 | TOTALS |
|--|------|--------------------|--------------------|--------|
| 14 | 03/19/2010 | $ 9,000.00 | | $ 9,000.00 |
| 15 | 03/22/2010 | 9,000.00 | | 9,000.00 |
| | TOTAL | | | $ 18,000.00 |
| 16 | 04/02/2010 | $ 9,000.00 | | $ 9,000.00 |
| 17 | 04/05/2010 | 6,000.00 | | 6,000.00 |
| | TOTAL | | | $ 15,000.00 |
| 18 | 05/21/2010 | | $ 9,000.00 | $ 9,000.00 |
| 19 | 05/24/2010 | | 8,000.00 | 8,000.00 |
| | TOTAL | | | $ 17,000.00 |
| 20 | 06/25/2010 | $ 9,300.00 | | $ 9,300.00 |
| 21 | 06/28/2010 | 5,000.00 | | 5,000.00 |

18

|     | TOTAL      |            |            | $ 14,300.00  |
| --- | ---------- | ---------- | ---------- | ------------ |
| 22  | 07/30/2010 | $ 9,400.00 |            | $ 9,400.00   |
| 23  | 08/02/2010 | 4,000.00   |            | 4,000.00     |
|     | TOTAL      |            |            | $ 13,400.00  |
| 24  | 08/06/2010 | $ 6,400.00 |            | $ 6,400.00   |
| 25  | 08/09/2010 |            | $ 9,000.00 | 9,000.00     |
|     | TOTAL      |            |            | $ 15,400.00  |
| 26  | 08/11/2010 |            | $ 5,400.00 | $ 5,400.00   |
| 27  | 08/12/2010 |            | 8,000.00   | 8,000.00     |
| 28  | 08/13/2010 |            | 9,600.00   | 9,600.00     |
| 29  | 08/16/2010 |            | 9,600.00   | 9,600.00     |
|     | TOTAL      |            |            | $ 32,600.00  |
| **GRAND TOTAL** |       | **$ 67,100.00** | **$ 58,600.00** | **$ 125,700.00** |

Your affiant only identified one instance where Wetselaar made cash deposits that did not appear to be structured. On April 9, 2010, one deposit was for $15,000 and another for $4,000. A FinCEN Form 104 Currency Transaction Report ("CTR") was prepared for $15,000 by the appropriate financial institution. No report was prepared for, or including, the $4,000 deposit.

Based on the transactions exhibited in Tables 1 through 4 above, your Affiant has probable cause to believe that on at least twenty (20) occasions Wetselaar conducted, aided, or assisted in conducting transactions that caused a domestic financial institution to not file a currency transaction report (CTR).

Based on Wetselaar's role in the drug trafficking organization outlined above, the dramatic increase in Wetselaar's controlled substance prescribing practices, and banking activity beginning in

June 2009, your Affiant has probable cause to believe that the cash deposited into JP Morgan Chase Bank account x3079, Wells Fargo Bank account x9402, and Nevada State Bank personal checking account x3353, no later than June 2009 were proceeds of Wetselaar's illegal drug diversion and sale of controlled substances activities.

After conducting the above financial analysis, your Affiant believes there is probable cause to believe that drug proceeds deposited in the above bank accounts are, at a minimum, commingled with legitimate sources of income and legitimate beginning cash balances. Because of the volume of cash business Dr. Wetselaar was doing with his illegal drug trafficking, I believe that most if not all of the money in these accounts is traceable to his illegal drug trafficking. By depositing cash that represents drug proceeds into bank accounts, the bank accounts become tainted and commingled. Once the bank accounts become tainted, funds cannot become untainted; funds in a commingled bank account still involve drug proceeds even though months may pass and other transactions have occurred since or during the periods which drug proceeds were commingled. See United States v. Marbella, 73 F.3d 1508, 1516 (9th Cir. 1994)(holding that once proceeds from a specified unlawful activity (SUA) are commingled in an account, any withdrawal from that account involves proceeds - even if the balance in the account drops to zero between the time the proceeds are deposited and the time of the withdrawal); See also United States v. Ward, 197 F.3d 1076, 1083 (11th Cir. 1999)(holding that once proceeds become tainted, they cannot become untainted. The Court also held that funds in a commingled bank account still involve SUA proceeds even though months may have passed and other transactions have occurred since the SUA proceeds were commingled). Additionally, the deposit of the drug proceeds with legitimately obtained funds hides or conceals the illegal funds and gives the appearance of legitimacy.

I.      **Reimbursements from Medical Insurance Companies**

From August 1, 2008 through August 31, 2010, deposits from medical insurance companies

20

into account x3079 began to decrease.  Up until 2010, monthly insurance reimbursements never dropped below $17,000.  Then, beginning around January of 2010 and continuing until the end of August 2010, insurance reimbursements began to trend downward.  During the downward trend, the month of January 2010 received the highest reimbursed amount of $11,626.97.  From February 2010 through August 2010, medical reimbursements averaged $3,995.94, with no single month exceeding $5,887 in deposits.  For four of the months duirng that same time period, medical insurance reimbursements were below $3,000, with the lowest reimbursement being of $2,687.37.  The downward trend represented a decrease in medical insurance claims by NAMG.

J.    **Purchase of Real Estate and Subsequent Transfer of Deed**

On December 29, 2009, a wire transfer in the amount of $105,099.06, an amount greater than $10,000, was sent out of account x9402, to a second financial institution reflecting Equity Title of Nevada as the beneficiary.

Equity Title of Nevada escrow file 09671310 reflects a receipt of an incoming wire on December 29, 2009, in the amount of $105,099.06.  This wire originated from x9402 and the funds were used to close a real estate transaction for residential property at 6102 Falconer Avenue, Las Vegas, Nevada.  This transaction finalized Wetselaar's purchase of this property, which is a residential property.  The purchase of the home located on Falconer Avenue occurred on exactly the same day that Wetselaar made a single cash deposit into Wells Fargo account x9802, in the amont of $44,000.  That purchase was recorded on January, 6, 2010 by the Clark County Recorder's office, which recorded a transfer of Deed for 6102 Falconer Avenue, Las Vegas, Nevada, to Wetselaar.

On August 29, 2011, the Clark County Recorder's office recorded a Quit Claim of Deed for 6102 Falconer Avenue, Las Vegas, Nevada from Wetselaar to Zi Jun Fan ("Fan").  Fan's birth mother is Bing Wetselaar making Fan Wetselaar's step-son.  The recorded Quit Claim is signed, dated, and notarized on August 15, 2011 and also indicates that the transfer is from parents to son

1  and that it's being transacted for $0.00 in consideration.

2       As stated above, based on Your Affiant's training and experience, he knows that deals

3  without consideration and made to closely tied relatives is one manner in which money launderers

4  and drug traffickers attempt to conceal true ownership of ill-gotten assets and continue to exert

5  control over those assets.

6  **K.    Purchase of Securities**

7       Your Affiant conducted an analysis of Edward D. Jones trading accounts, specifically

8  account #441-05297-1-5 (hereinafter "x7-1-5").  Wetselaar opened, directed, and had signatory

9  authority over x7-1-5 throughout the time period of this analysis.  The time period reviewed for x7-

10  1-5 was August 2008 to August 2010.

11      Trading account x7-1-5 can be explained as an umbrella account.  Within x7-1-5 is a cash

12  money market account (hereinafter "x7-1-5 cash account") and five security accounts.  The security

13  accounts consist of a bonds account, a stock account, a mutual fund account, a limited partnerships

14  account, and an annuities account (hereinafter referred collectively as "x7-1-5 securities accounts").

15      Only two of the x7-1-5 securities accounts were established in August 2008 at the beginning

16  of the review period; however, through the period under review and by August 2010, Wetselaar had

17  opened and transferred funds into all x7-1-5 security accounts.  Below is an analysis of ending

18  balances in the x7-1-5 cash account and the aggregate ending balance in the x7-1-5 securities

19  accounts as well as the combination of all investments held in the entire trading account x7-1-5.

20  **Table 5: Ending Balance Analysis for Account x7-1-5**

| Statement Date | x7-1-5 Cash Account | x7-1-5 Securities Accounts | Total Investments |
|---|---|---|---|
| 09/28/2008 | $  1,098.57 | $  141,690.75 | $  142,789.32 |
| 11/28/2008 | 1,099.18 | 107,041.82 | 108,141.00 |

22

| | | | |
|---|---|---|---|
| 12/31/2008 | 1,124.27 | 111,141.24 | 112,265.51 |
| 01/30/2009 | 1,137.57 | 107,830.01 | 108,967.58 |
| 02/27/2009 | 1,150.87 | 100,107.87 | 101,258.74 |
| 03/27/2009 | (10,482.64) | 129,174.30 | 118,691.66 |
| 04/24/2009 | 1,177.47 | 148,552.61 | 149,730.08 |
| 05/29/2009 | 1,190.77 | 156,037.74 | 157,228.51 |
| 06/26/2009 | 1,204.07 | 167,422.37 | 168,626.44 |
| 07/31/2009 | 1,593.14 | 175,923.71 | 177,516.85 |
| 08/28/2009 | 1,803.18 | 180,878.67 | 182,681.85 |
| 09/25/2009 | 2,345.70 | 185,771.72 | 188,117.42 |
| 10/30/2009 | 2,638.23 | 187,050.29 | 189,688.52 |
| 11/27/2009 | 2,651.53 | 191,902.01 | 194,553.54 |
| 12/31/2009 | 3,042.14 | 193,994.03 | 197,036.17 |
| 01/29/2010 | 152.00 | 308,333.23 | 308,485.23 |
| 02/26/2010 | 25,667.63 | 311,962.45 | 337,630.08 |
| 03/27/2010 | 1,117.07 | 394,833.64 | 395,950.71 |
| 04/30/2010 | 1,673.77 | 480,721.35 | 482,395.12 |
| 05/28/2010 | 10,388.14 | 486,355.74 | 496,743.88 |
| 06/25/2010 | 690.84 | 564,166.84 | 564,857.68 |
| 07/30/2010 | 2,092.72 | 624,534.48 | 626,627.20 |
| 08/27/2010 | 5,222.47 | 632,994.85 | 638,217.32 |

Your Affiant also analyzed deposits into x7-1-5 for the time period. Below is a summary of deposits by month made into the x7-1-5 cash account. These deposits were analyzed even further and classified by source as either a personal check written from a bank account, a certified check from a broker either purchased with cash or funds on deposit, and one for a check received from American Coin Express, Inc. ("ACE, Inc.").

Table 6: Total Monthly Deposits into Trading Account x7-1-5

| Statement | Monthly Deposits | | | |
| Date | Personal | Certified | ACE, Inc. | Total |
| --- | --- | --- | --- | --- |
| 03/27/2009 | $ 10,312.27 | $ 0.00 | $ 0.00 | $ 10,312.27 |
| 04/24/2009 | 26,578.16 | 0.00 | 0.00 | 26,578.16 |
| 05/29/2009 | 0.00 | 0.00 | 0.00 | 0.00 |
| 06/26/2009 | 9,716.16 | 0.00 | 0.00 | 9,716.16 |
| 07/31/2009 | 0.00 | 0.00 | 0.00 | 0.00 |
| 08/28/2009 | 0.00 | 0.00 | 0.00 | 0.00 |
| 09/25/2009 | 0.00 | 0.00 | 0.00 | 0.00 |
| 10/30/2009 | 0.00 | 0.00 | 0.00 | 0.00 |
| 11/27/2009 | 0.00 | 0.00 | 0.00 | 0.00 |
| 12/31/2009 | 0.00 | 0.00 | 0.00 | 0.00 |
| 01/29/2010 | 25,000.00 | 146,125.03 | 0.00 | 171,125.03 |
| 02/26/2010 | 25,000.00 | 0.00 | 0.00 | 25,000.00 |
| 03/27/2010 | 51,016.88 | 0.00 | 0.00 | 51,016.88 |
| 04/30/2010 | 69,000.00 | 0.00 | 11,250.00 | 80,250.00 |
| 05/28/2010 | 5,000.00 | 28,500.00 | 0.00 | 33,500.00 |
| 06/25/2010 | 0.00 | 62,960.00 | 0.00 | 62,960.00 |
| 07/30/2010 | 41,996.38 | 6,910.00 | 0.00 | 48,906.38 |
| 08/27/2010 | 4,455.33 | 11,000.00 | 978.26 | 16,433.59 |
| Total | $ 268,075.18 | $ 255,495.03 | $ 12,228.26 | $ 535,798.47 |

Account x7-1-5 functioned in the following manner: Wetselaar deposited monetary instruments into cash account x7-1-5 and then transferred these deposits to security accounts x7-1-5. These transfers to the securities reflect that, despite deposits of $535,798.47 (exhibited in Table 6 above), the x7-1-5 cash account balance remains fairly linear month after month. In contrast, the

1    x7-1-5 securities accounts grow in relative value (exhibited in Table 5 above).  This trend of

2    depositing funds into cash account x7-1-5 that are subsequently transferred to security accounts x7-

3    1-5 is also evident in the monthly statements examined for the review period.

4          Like with the aforementioned cash deposits, after conducting the above financial analysis,

5    your Affiant believes there is probable cause to believe that drug proceeds were deposited into the

6    Edward D. Jones account ending in x7-1-5.  Those proceeds are, at a minimum, commingled with

7    legitimate sources of income and legitimate beginning cash balances.  By depositing cash that

8    represents drug proceeds into bank accounts, the bank accounts become tainted and commingled.

9    Once the bank accounts become tainted, funds cannot become untainted.  Funds in a commingled

10   bank account still involve drug proceeds, even though months may pass and other transactions have

11   occurred since or during the periods which drug proceeds were commingled.  Additionally, the

12   deposit of the drug proceeds with legitimately obtained funds, hides or conceals the illegal funds,

13   and attempts to give the appearance of legitimacy.

14   **M.    Cash Purchases of Gold Kruggerands**

15         During review of Wetselaar's financial activity, your Affiant observed that there was a single

16   check written to from an ACE, Inc. $11,250 and deposited into Wetselaar's Edward Jones cash

17   account ending in x7-1-5.  Other than the above check, there were no records of a business

18   relationship or transactions between ACE, Inc. and Wetselaar.  Knowing that ACE, Inc. is a business

19   involved in the selling and buying of gold coins, your Affiant conducted further investigation into

20   this transaction.  The investigation stemmed from a statement from Wetselaar's employee,

21   Hoffbauer.  Hoffbauer advised that Wetselaar had an affection for South African Kruggerands,

22   which your Affiant learned are gold coins without face-value that are some of the most frequently

23   exchanged gold pieces on the precious metals market.  Kruggerands are valued based on their

24   particular series gold content and the fair market value of gold.  Hoffbauer stated that Wetselaar

                                          25

purchased Kruggerands from American Coin Express ("ACE, Inc.") and that an employee of ACE named Mike would personally deliver Kruggerands to Wetselaar at his office. Likewise, Hoffbauer knew of Wetselaar to stop by ACE, Inc. when he was out of the office and purchase the Kruggerands there.

During the review of Wetselaar's financial records there was only the one, aforementioned check written to Wetselaar for $11,250 and deposited into Wetselaar's Edward Jones cash account ending in x7-1-5. Other than the above check, there were no records of a business relationship or transactions between ACE, Inc. and Wetselaar.

On or around September 23, 2011, your Affiant performed a search of the Financial Crimes Enforcement Network ("FinCEN") database for trade and business currency reporting records related to Wetselaar and ACE, Inc, however, no records could be found. Based on his training and experience, as well as Wetselaar's knowledge of currency reporting requirements, and confession to avoiding CTRs, your Affiant has probable cause to believe that when Wetselaar transacted cash with ACE, Inc., the transactions were structured or conducted at or under the $10,000 threshold, or were conducted in non-cash transactions, to intentionally avoid reporting requirements, and thus avoiding detection of Wetselaar's gold dealings, and discovery by law enforcement.

Your Affiant also has probable cause to believe that Wetselaar's transactions with ACE, Inc. were conducted with SUA proceeds and done in amounts low enough to conceal the source or nature of these proceeds and avoid the reporting requirement and the records of the transactions constitute evidence of money laundering and structuring. From my experience and training I am aware that drug traffickers, like ordinary investors in precious metals, typically keep their precious metals in safe deposit boxes or in safes located in their residences. Consequently, your Affiant believes that records potential transactions may be located at Nevada State Bank, 4970 East Tropicana Avenue, Las Vegas, NV 89121, in safe deposit box # FSO741, 50741-2 in the name of Henri and Bing

26

1   Wetselaar.

2   N.   **Nevada State Bank Safe Deposit Box**

3   During an examination of Nevada State Bank subpoenaed records, Your Affiant identified a

4   Safe Deposit Box FSO 741, 50741-2 ("safe deposit box 741-2") leased to Henri Wetselaar and Bing

5   Wetselaar. Safe deposit box 741-2 is located inside Nevada State Bank's Tropicana/Nellis Branch at

6   4970 East Tropicana Avenue, Las Vegas, NV 89121. A rental agreement, "Record of Access", and

7   restriction card for safe deposit box 741-2 were examined by your Affiant. According to the rental

8   agreement, safe deposit box 741-2 was leased to Henri Wetselaar and Bing Wetselaar on October

9   21, 1997 (however, the restriction card indicates that "Bing Wetselaar needs to sign access card").

10   The "Record of Access" documents five occasions where the safe deposit box was accessed.

11   These entries begin on August 10, 2009, and end on September 28, 2009. In addition to the first and

12   last days noted above on the "Record of Access" there is an entry for September 21, 2009.

13   On September 28, 2011, your Affiant confirmed that Safe Deposit Box FSO 741, 50741-2

14   ("safe deposit box 741-2") leased to Henri Wetselaar and Bing Wetselaar, is still open. The safe

15   deposit box was last accessed by both Henri and Bing Wetselaar on September 26, 2011.

16   Based on his training and experience, your Affiant knows that narcotics traffickers and

17   money launderers will often use safe deposit boxes as a method to conceal evidence and fruits of

18   their crimes. Your Affiant has probable cause to believe that when Wetselaar accessed his safe

19   deposit box on the overlapping days it was probable that he used the safe deposit box to conceal the

20   cash withdrawn from x9402. Title 18 U.S.C. 1956(c)(3) includes the placing of proceeds of a

21   specified unlawful activity (SUA) into a safe deposit box as a violation of Federal money laundering

22   laws. As a result of your Affiant's review of Wetselaar's financial activity, your Affiant believes

23   there is probable cause that Safe Deposit Box FSO 741, 50741-2 ("safe deposit box 741-2") is still

24   being used by Henri Wetselaar and that the contents of safe deposit box 741-2 may contain proceeds

1  of a specified unlawful activity or property traceable thereto.

2  ### CONCLUSION OF AFFIANT

3  There is probable cause to believe that the assets listed above:

4      a.    are proceeds traceable to exchanges of controlled substances in violations of

5  21 §§ U.S.C. 841 and 846, are subject to seizure pursuant to 21 U.S.C § 881(b) and 18

6  U.S.C. § 981(b), and are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6);

7      b.    are used or intended to be used to facilitate violations of 21 U.S.C. §§ 841 and

8  846, are subject to seizure pursuant to 21 U.S.C. § 881(b) and 18 U.S.C. § 981(b), and are

9  subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6);

10      c.    are involved in transactions or attempted transactions in violations of 18

11  U.S.C. § 1956 or property traceable to such property, are subject to seizure pursuant to 18

12  U.S.C. § 981(b), and are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1); and

13      d.    are involved in transactions or attempted transactions in violations of 18

14  U.S.C. § 1957 or property traceable to such property, are subject to seizure pursuant to 18

15  U.S.C. § 981(b), and are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1).

16      e.    are involved in violations of 31 U.S.C. § 5324, or a conspiracy to commit

17  such violations, are subject to seizure pursuant to 18 U.S.C. § 981(b), and are subject to

18  forfeiture pursuant to 31 U.S.C. § 5317(c)(2);

19      f.    are property traceable to violations of 31 U.S.C. § 5324, or a conspiracy to

20  commit such violations, is subject to seizure pursuant to 18 U.S.C. § 981(b), and are subject

21  to forfeiture pursuant to 31 U.S.C. § 5317(c)(2);

22      g.    are involved in violations of 31 U.S.C. § 5313, or a conspiracy to commit

23  such violations, are subject to seizure pursuant to 18 U.S.C. § 981(b), and are subject to

24  forfeiture pursuant to 31 U.S.C. § 5317(c)(2); and

h.      are property traceable to violations of 31 U.S.C. § 5313, or a conspiracy to commit such violations, are subject to seizure pursuant to 18 U.S.C. § 981(b), and are subject to forfeiture pursuant to 31 U.S.C. § 5317(c)(2).

Also, the evidence set out above establishes probable cause to believe the following assets are subject to seizure and forfeiture:

a.      Any and all funds held at Wells Fargo, 530 Las Vegas Blvd South, Las Vegas, NV, 89101, in bank account # 1070039402 in the name Henri Wetselaar;

b.      Any and all funds held at JP Morgan Chase Bank, 2865 East Charleston Blvd, Las Vegas, NV 89104, in bank account # 3152283079 in the name Henri Wetselaar d/b/a NEW AMSTERDAM MEDICAL GROUP;

c.      Any and all funds held at Nevada State Bank, 4970 East Tropicana Avenue, Las Vegas, NV 89121, in bank account # 100063353 in the name Henri Wetselaar;

d.      Any and all U.S. Currency or gold krugerrands held at Nevada State Bank, 4970 East Tropicana Avenue, Las Vegas, NV 89121, in safe deposit box # FSO741, 50741-2 in the name of Henri and Bing Wetselaar; and

e.      Any and all cash, deposits, money market funds, bonds, stocks, mutual funds, and partnerships held at Edward Jones, 1000 N Green Valley Parkway, Suite 500, Henderson, NV 89074, in trading account # 441-05297-1-5 in the name Henri Wetselaar.

_____/s/_____

ROBERT NORRIS
Special Agent, IRS-CI

Subscribed and sworn to before me
this 3rd day of ~~September~~, 2011.
        October

Peggy A. Leen
UNITED STATES MAGISTRATE JUDGE

29

Exhibit B - Affidavit of IRS-CI SA Robert Norris for a criminal search warrant of Safe Deposit Boxes 4010, 4025, and 1656 at 24/7 Private Vaults issued on October 3, 2011

Exhibit B - Affidavit of IRS-CI SA Robert Norris for a criminal search warrant of Safe Deposit Boxes 4010, 4025, and 1656 at 24/7 Private Vaults issued on October 3, 2011

DANIEL G. BOGDEN
United States Attorney
CRISTINA SILVA
Assistant United States Attorneys
333 Las Vegas Blvd. South, Ste. 5000
Las Vegas, Nevada 89101
(702) 388-6585 / Fax (702) 388-6698

FILED

U.S. MAGISTRATE JUDGE

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
-oOo-

UNITED STATES OF AMERICA,

Plaintiff,

v.

Safe deposit box #4010, located at 24/7 Private Vaults, 3110 East Sunset Road, Las Vegas, NV 89120;

and

Safe deposit box #4025, located at 24/7 Private Vaults, 3110 East Sunset Road, Las Vegas, NV 89120;

and

Safe deposit box #1656, located at 24/7 Private Vaults, 3110 East Sunset Road, Las Vegas, NV 89120.

Defendant.

2:11-mj-0648-PAL

### AFFIDAVIT OF ROBERT NORRIS

I, Robert Norris (your Affiant), hereby swears and affirms as follows:

### INTRODUCTION

**A.    AGENT'S BACKGROUND AND EXPERIENCE**

1.    Your Affiant is a Special Agent ("SA") with Internal Revenue Service-Criminal

1

Investigation ("IRS-CI") and has been so employed since September 2008. Your Affiant possesses a bachelor's degree in accounting and has received extensive training in financial investigative techniques. He is currently assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF") and the High Intensity Drug Trafficking Area Task Force ("HIDTA") at the Las Vegas Office of the Drug Enforcement Administration ("DEA") and has been since April 2010. He has conducted numerous investigations relating to violations of the internal revenue laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), money laundering statutes (Title 18, United States Code, Section 1956, 1957), and related offenses perpetrated against the United States Government.

2.      Your Affiant has received training and has collaborated with other law enforcement agencies concerning investigations involving the unlawful possession and distribution of controlled substances, and is familiar with Federal laws involving their illegal purchase, distribution, and possession.

3.      As assigned to the DEA, your Affiant has become familiar with the manner in which controlled substances are acquired and distributed within the licit and illicit market, the methods of payment for such controlled substances, the efforts involved in such activity to avoid detection by law enforcement, and the methods used by pharmaceutical controlled substance diverters to conceal the nature of their illegal activity.

4.      Your Affiant is presently involved in an ongoing criminal investigation of Dr. Henri Wetselaar (hereinafter "Wetselaar") regarding violations of Federal drug trafficking, money laundering, and bank secrecy laws. This investigation is ongoing and your Affiant is being assisted by the DEA and the other local police departments.

5.      Based on my training and experience in conducting financial investigations, your Affiant is familiar with the methods and practices used by individuals and organizations involved in

2

financial crimes and illicit activities such as drug trafficking that generate large amounts of income. These methods include cash purchases, the use of aliases and nominees, the use of businesses as "fronts" in an attempt to legitimize and conceal their activities, and the structuring of financial transactions in a manner to avoid Federal reporting requirements by financial institutions. Your Affiant has experience in debriefing defendants, participant witnesses, informants, and other persons who have had personal experience and knowledge of amassing, spending, converting, transporting, distributing, and concealing profits from illegal activities.

6.     Unless stated otherwise, your Affiant has personal knowledge of the matters set out in this affidavit. To the extent that any information in this affidavit is not within your Affiant's personal knowledge, it was made known to your Affiant through my own review of records provided by financial institutions and interviews of witnesses, and through reliable law enforcement sources, including discussions with other law enforcement agents, which causes me to believe the information to be true.

**B.     LOCATIONS TO BE SEARCHED**

7.     This affidavit is made in support of an application to search the following:

a.  **Subject Premises 3**: Safe deposit box #4010, located at 24/7 Private Vaults, 3110 East Sunset Road, Las Vegas, NV 89120.

b.  **Subject Premises 4**: Safe deposit box #4025, located at 24/7 Private Vaults, 3110 East Sunset Road, Las Vegas, NV 89120.

c.  **Subject Premises 5**: Safe deposit box #1656, located at 24/7 Private Vaults, 3110 East Sunset Road, Las Vegas, NV 89120.

Further descriptions of the locations to be searched, collectively referred to as the subject premisees, are described in particularity and set forth in" Attachment A" of the Search Warrant,

3

attached hereto and incorporated herein.

## BASIS OF INFORMATION IN AFFIDAVIT

8.     This affidavit is based upon personal knowledge that your Affiant has gained from his participation in this investigation, and search warrant, as well as information learned from other law enforcement agencies involved in this investigation, including IRS-CI and the Las Vegas Office of the Drug Enforcement Administration ("DEA").

9.     This affidavit is intended to show that there is sufficient probable cause for a search warrant at the Subject Premisees outlined above.  This affidavit is not intended to be a complete statement of all known information of evidentiary value, and it does not purport to set forth all of my knowledge of, or investigation into this matter.

## SUMMARY OF FACTS ESTABLISHING PROBABLE CAUSE FOR THE REQUESTED SEARCH WARRANT

10.     The previously sworn to Affidavit of your affiant, Special Agent Robert Norris is attached hereto as Exhibit C and is incorporated herein by reference as if fully set forth herein.

## SERVICE OF FEDERAL SEARCH WARRANT ON SEPTEMBER 29, 2011

11.     On September 29, 2011, SA's and Task Force Officers from the IRS-CI and DEA, served a federal search warrant at Henri Wetselaar's residence located at 3681 Foretscrest Drive, Las Vegas, NV 89121 (Subject Premises 1) and Safe Deposit Box FSO741, 50741-2 in the name of Henri and Bing Wetselaar located at Nevada State Bank, 4970 East Tropicana Avenue, Las Vegas, NV 89121 (Subject Premises 2).

12.     During the search of Subject Premises 1 law enforcement located the following items, which is not a complete list:

1)  Approximately $100,000 in U.S. Currency

2)  Government issued bonds totally approximately $40,000;

3)  An undetermined amount of gold and silver coins (values will be evaluated at a later time);

4)  What appeared to handwritten cash ledgers;

5)  An undetermined amount of foreign currency;

6)  Property deeds;

7)  Travel documents.

13.    Also during the search of Subject Premises 1, IRS-CI Special Agent Tiffany Lowe discovered a plastic zip-loc bag inside of a briefcase that was located in an office of the residence. Inside the plastic bag were handwritten notes and four flat skeleton keys. Two silver keys were affixed to a red key ring, and two gold keys were affixed to a black key ring. None of the keys appeared to be identical. A handwritten note within the bag read "420257#", "4025=red", "u1656=black", and "4010D". A separate handwritten note within the plastic bag read "40257#", "Total about 150 gold coins", had the figures "150,000", "160,000", "140,000", "100,000", "100,000", "100,000", "10,000", "760,000", " u 1656 100,000", and "860,000." Your Affiant notes that the combination of the first seven numbers listed above appears to be a tally of numbers, which equals the eighth number list above (760,000). Further, the 760,000 number combined with the ninth number (100,000) equals the tenth number listed on the document (860,000), which again appears to be a record of items.

13.    There were also many other documents in the same office where the briefcase and the zip-loc bag were located, including, but not limited to, bank statements, loan repayment transactions, gross receipts ledgers, cash payment receipts, and patient files. Many of the examined documents appeared to be addressed to or in the name of Dr. Henri Wetselaar (hereinafter "Wetselaar").

5

14.     Based on your Affiant's training and experience in conducting investigations and executing search warrants, most safe deposit boxes are secured with either a single lock and key, or a dual lock and two keys where the renter holds one key and the institution from where the safe deposit box is rented holds the second key.

15.     Given my training and experience, the keys that were located inside the zip-loc bag within the briefcase in Wetselaar's office are keys associated with safe deposits boxes at 24/7 Private Vaults located at 3110 East Sunset Road, Las Vegas, NV 89120. Your Affiant is familiar with 24/7 Private Vaults. 24/7 Private Vaults markets to a specific clientele seeking privacy and anonymity. Further, 24/7 Private Vaults have mechanisms and business practices in place that promote privacy, including tracking renters by code words, box specific applications, and retna scans. These privacy-focused practices are different than the traditional means used to obtain and utilize safe deposits boxes such as a name, a social security number, or a date of birth. 24/7 Private Vaults uses locks to secure safe deposit boxes; however, keys are given to the renter and none are held by 24/7 Private Vaults.

16.     Also on September 29, 2011, DEA Special Agent (SA) Kevin Gillespie and Task Force Officer (TFO) Tony Campanella also executed the search warrant of Subject Premises 2. Inside Subject Premises 2, the agents discovered an undetermined amount of yellow and silver colored coins.

17.     Given the handwritten notes and the keys that were found in Wetselaar's office, together with my familiarity with the 24/7 business that your Affiant shared with other law enforcement officers, DEA Task Force Officer Kendra Still and DEA Special Agent Chris Johnson went to 24/7 Private Vaults on September 29, 2011. Upon arrival at the location, the officers observed a keypad at the main entrance. TFO Still and SA Johnson input the numbers "40257#" from one of the handwritten notes into the key pad at the main entrance and were granted access to

the lobby of the business.  TFO Still and SA Johnson showed the keys to an unidentified employee of 24/7 Private Vaults who recognized the keys as those similar to ones used by 24/7 Private Vaults. The employee further indicated that the gold keys appear to be those typically used by 24/7 Private Vaults for dual lock boxes and the silver keys are typically used for single lock boxes.

18.    Based on your Affiant's training and experience and the probable cause established in the abovereferenced affidavit, attached hereto and incorporate herein as Exhibit C, together with the following items:

a)    The U.S. Currency, U.S. Bearer Bonds, gold and silver coins located at Subject Premises 1;

b)    The gold and silver coins located at Subject Premises 2;

c)    The handwritten notes, together with the keys that appear to belong to safe deposit boxes which were located within a zip-loc bag, in a briefcase inside the office of Subject Premises 1;

d)    The access code on the handwritten note from the briefcase that opened the lobby at 24/7 Vaults; and

e)    The numbers listed on the accompanying documents, where appear to be safe deposit box numbers

your Affiant has probable cause to believe that the abovementioned keys discovered at Subject Premises 1 are for safe deposit box #4010, safe deposit box #4025, and safe deposit box #1656 located at 24/7 Private Vaults located at 3110 East Sunset Road, Las Vegas, NV 89120, further detailed in "Attachment A" as **Subject Premisees 3, 4, and 5.**

19.    Further, your Affiant has probable cause to believe that **Subject Premisees 3, 4, and 5** contain evidence of, fruits of, or property or proceeds traceable to, violations of Federal law, including possible violations of 21 §§ U.S.C. 841 and 846, 18 U.S.C. § 1956 and 1957, 31 U.S.C. §

7

5324 and 5313, or a conspiracy to commit such violations.

## CONCLUSION

I respectfully request that a search warrant be issued that authorizes the search of **Subject Premises 3, 4**, and **5**, described in Attachment A, and the search and seizure of the items described in Attachment B.

/s/

ROBERT NORRIS
Special Agent
IRS-Criminal Investigation

Subscribed and sworn to before me
this 3rd day of ~~September~~ 2011.
       October

Peggy A. Leen
United States Magistrate Judge

8

# ATTACHMENT A

## DESCRIPTION OF PROPERTY TO BE SEARCHED

**Subject Premises 3**

Safe deposit box # 4010 is located at 3110 East Sunset Road, Suite H, Las Vegas, NV 89120.  This location is further described as located within 24/7 Private Vaults, a business located on the inner corner of an "L" shaped business complex; specifically, a safe deposit box with corresponding assigned number 4010.

**Subject Premises 4**

Safe deposit box # 4025 is located at 3110 East Sunset Road, Suite H, Las Vegas, NV 89120.  This location is further described as located within 24/7 Private Vaults, a business located on the inner corner of an "L" shaped business complex; specifically, a safe deposit box with corresponding assigned number 4025.

**Subject Premises 5**

Safe deposit box # 1656 is located at 3110 East Sunset Road, Suite H, Las Vegas, NV 89120.  This location is further described as located within 24/7 Private Vaults, a business located on the inner corner of an "L" shaped business complex; specifically, a safe deposit box with corresponding assigned number 1656.

# ATTACHMENT B

ITEMS TO BE SEARCHED FOR AND SEIZED AT SUBJECT **PREMISE 3, 4,** and **5:**

   A. United States and foreign currency,

   B. Precious metals,

   C. Jewelry for which receipts or other documentation or admissions show was purchased on or after August 1, 2008,

   D. Negotiable financial instruments including: stocks, bonds, securities, cashier's checks, money drafts, bearer bonds and instruments, and letters of credit,

   E. Books, records, receipts, notes, ledgers, personal checks and other papers relating to the transportation, ordering, purchase and distribution of controlled substances,

   F. Property deeds and other books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks,

   G. Safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transfer, concealment, or expenditure of money,

   H. Address and/or telephone books, digital pagers, address and/or telephone books, Rolodex indices, electronic organizers, and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers, e-mail addresses, facebook account information and other contact information related to co-conspirators, customers, financial institutions, and other individuals or businesses with whom a financial relationship exist,

   I. Not more than 10 records or other items evidencing indicia of rental of the premises described herein, including, but not limited to rental, purchase or lease agreements, billing invoices, payment receipts, and keys.

Exhibit C - Affidavit of IRS-CI SA Robert Norris for a criminal search warrant of Safe

Deposit 1023 at 24/7 Private Vaults issued on October 5, 2011

Exhibit C - Affidavit of IRS-CI SA Robert Norris for a criminal search warrant of Safe

Deposit 1023 at 24/7 Private Vaults issued on October 5, 2011

1   DANIEL G. BOGDEN
    United States Attorney

2   CRISTINA D. SILVA
    CRANE M. POMERANTZ

3   Assistant United States Attorney
    333 Las Vegas Blvd. South, Ste. 5000

4   Las Vegas, Nevada 89101
    (702) 388-6586 / Fax (702) 388-6698

FILED

2011 OCT -5 AM 8: 27

U.S. MAGISTRATE JUDGE
BY_____

5

6                  **UNITED STATES DISTRICT COURT**
                        **DISTRICT OF NEVADA**

7                              -oOo-

8   UNITED STATES OF AMERICA,            2:11-mj-658-PAL
                         Plaintiff,

9

10  v.

11  Safe deposit box #1023, located at 24/7 Private
    Vaults, 3110 East Sunset Road, Las Vegas, NV

12  89120
                         Defendant.

13

14              **AFFIDAVIT IN SUPPORT OF FOR SEARCH WARRANT**

15       I, Robert Norris (your Affiant), hereby swears and affirms as follows:

16                         <u>**INTRODUCTION**</u>

17       **A.    AGENT'S BACKGROUND AND EXPERIENCE**

18       1.    Your Affiant is a Special Agent ("SA") with Internal Revenue Service-Criminal
    Investigation ("IRS-CI") and has been so employed since September 2008. Your Affiant possesses a
    bachelor's degree in accounting and has received extensive training in financial investigative
    techniques. He is currently assigned to the Organized Crime Drug Enforcement Task Force
    ("OCDETF") and the High Intensity Drug Trafficking Area Task Force ("HIDTA") at the Las Vegas
    Office of the Drug Enforcement Administration ("DEA") and has been since April 2010. He has
    conducted numerous investigations relating to violations of the internal revenue laws (Title 26,
    United States Code), the Bank Secrecy Act (Title 31, United States Code), money laundering
    statutes (Title 18, United States Code, Section 1956, 1957), and related offenses perpetrated against

1

the United States Government.

2.     Your Affiant has received training and has collaborated with other law enforcement agencies concerning investigations involving the unlawful possession and distribution of controlled substances, and is familiar with Federal laws involving their illegal purchase, distribution, and possession.

3.     As assigned to the DEA, your Affiant has become familiar with the manner in which controlled substances are acquired and distributed within the licit and illicit market, the methods of payment for such controlled substances, the efforts involved in such activity to avoid detection by law enforcement, and the methods used by pharmaceutical controlled substance diverters to conceal the nature of their illegal activity.

4.     Your Affiant is presently involved in an ongoing criminal investigation of Dr. Henri Wetselaar (hereinafter "Wetselaar") regarding violations of Federal drug trafficking, money laundering, and bank secrecy laws. This investigation is ongoing and your Affiant is being assisted by the DEA and other law enforcement departments.

5.     Based on my training and experience in conducting financial investigations, your Affiant is familiar with the methods and practices used by individuals and organizations involved in financial crimes and illicit activities such as drug trafficking that generate large amounts of income. These methods include cash purchases, the use of aliases and nominees, the use of businesses as "fronts" in an attempt to legitimize and conceal their activities, and the structuring of financial transactions in a manner to avoid Federal reporting requirements by financial institutions. Your Affiant has experience in debriefing defendants, participant witnesses, informants, and other persons who have had personal experience and knowledge of amassing, spending, converting, transporting, distributing, and concealing profits from illegal activities.

6.     Unless stated otherwise, your Affiant has personal knowledge of the matters set out in this affidavit. To the extent that any information in this affidavit is not within your Affiant's personal knowledge, it was made known to your Affiant through my own review of records provided by financial institutions and interviews of witnesses, and through reliable law enforcement sources,

including discussions with other law enforcement agents, which causes me to believe the information to be true.

## B.    LOCATIONS TO BE SEARCHED

7.    This affidavit is made in support of an application to search Safe Deposit Box #1023, located at 24/7 Private Vaults, 3110 East Sunset Road, Las Vegas, NV 89120, hereinafter referred to as **Subject Premises 6**.

8.    Further description of the location to be searched is described in particularity and set forth in "Attachment A" of this Search Warrant, attached hereto and incorporated herein.

### BASIS OF INFORMATION IN AFFIDAVIT

9.    This affidavit is based upon personal knowledge that your Affiant has gained from his participation in this investigation, and search warrant, as well as information learned from other law enforcement agencies involved in this investigation, including IRS-CI and the Las Vegas Office of the Drug Enforcement Administration ("DEA").

10.    This affidavit is intended to show that there is sufficient probable cause for a search warrant at the Subject Premisees outlined above.  This affidavit is not intended to be a complete statement of all known information of evidentiary value, and it does not purport to set forth all of my knowledge of, or investigation into this matter.

### SUMMARY OF FACTS ESTABLISHING PROBABLE CAUSE FOR THE REQUESTED SEARCH WARRANT

11.    The previously sworn to Affidavits of your Affiant, Special Agent Robert Norris are attached hereto as Exhibits C and D, and are incorporated herein by reference as if fully set forth herein.

12.    On October 2, 2011, an employee of 24/7 Private Vaults ("Employee 1") contacted Task Force Officer (TFO) Kendra Still regarding Wetselaar's safe deposit boxes.  Employee 1 informed TFO Still that they (24/7 Private Vault personnel) had discovered another safe deposit box belonging to WETSELAAR.  TFO Still was informed that the newly discovered safe deposit box, identified as **Subject Premises 6**, was found pursuant to the on-going investigation into Subject

3

Premises 3, 4, and 5. Employee 1 advised that a 24/7 Private Vaults computer records check revealed that **Subject Premises 3** is linked to **Subject Premises 6** by a matching retinal scan. The paperwork associated with **Subject Premises 6** was then checked. The paperwork revealed that **Subject Premises 3** was being rented by an individual who named the same beneficiary for both Subject Presmise 3 and **Subject Premises 6.** The beneficiary listed for both boxes was "W24E." TFO Still knows that "W" is the first letter of Wetselaar's last name and "24" is the year in which he was born.

13.    A second 24/7 Private Vaults employee ("Employee 2") advised that they were familiar with different ways people try to conceal their rental of larger safe deposit boxes at that location. Employee 2 told TFO Still that people will frequently get a small safe deposit box, which is referred to as a "dummy box," to try to conceal larger safe deposit boxes from law enforcement that contain valuables, or the fruits and instrumentalities of law violations. The renter of the "dummy box" will attach their retinal scan to the "dummy box," but will also rent out several other boxes that do not have any type of paperwork or scans that can be traced backed to the renter. By utilizing this strategy, the renters hope that if law enforcement comes in seeking any safe deposit boxes that that renter keeps, that they will only find the "dummy box," as it is the one with all the information leading to it. TFO Still was informed that this is a common occurrence at 24/7 Private Vaults.

14.    Employee 1 advised TFO Still that the retinal scans that one would use to access the facility through **Subject Premises 6** had been locked out of the system, but noted that a person holding the keys to the safe deposit box could easily follow another customer into the vault room and access the contents of the safe deposit box. As a result, knowing of the on-going investigation into Wetselaar, and given that TFO Still advised law enforcement would be seeking a Federal search warrant for **Subject Premises 6**, the 24/7 Private Vaults employee froze Subject Premise 6 by placing screws into the key holes of **Subject Premises 6** to prevent it from being accessed until a search warrant could be secured. During this process, your affiant began working on this search warrant application.

15.  On October 3, 2011, at approximately 11:30 a.m., law enforcement officers executed Federal search warrants for Subject Premises 3, 4, and 5 at 24/7 Private Vaults, located at 3110 East Sunset Road, Suite H, Las Vegas, NV 89120. Upon searching **Subject Premises 3,** your Affiant located a rental agreement for **Subject Premises 6** dated March 31, 2010.

16.  During the search of Subject Premises 3, 4, and 5, your Affiant, along with fellow law enforcement officers, also discovered applications for Subject Premise 5 and at least two additional rental applications and agreements where the safe deposit box number portion of the form had been torn away

17.  During the execution of the Federal search warrants on Subject Premises 3, 4, and 5, the following items were discovered:

    a)  **Subject Premises 3**

        i.  Application and rental agreements for **Subject Premises 3** and **Subject Premises 6**;

        ii.  Plastic retail bag from American Coin Express, Inc. ("ACE, Inc.");

        iii.  An unknown amount of U.S. Cash Currency banded together in two plastic bags;

        iv.  An unknown amount of Australian Cash Currency;

        v.  Two separate plastic bags with an unkown number and value of gold coins; and

        vi.  A hand written note reading " Sep. 3 '10, To David., -Re Contents, Keep $50,000 for yourself, Rest: Give Misty 65% and Janina 35%, Henri Wetselaar, M.D., 36814 Forestcrest Drive, Las Vegas, NV 89121.

    b)  **Subject Premises 4**

        i.  Application and rental agreements for unknown safe deposit boxes with specific vault identifiers torn off at 24/7 Private Vaults;

        ii.  An unknown number and value of gold and silver coins.

5

    c)    **Subject Premises 5:**

        i.    An unkown amount of U.S. Cash Currency banded and marked "$50,000."

        ii.    Application and rental agreement for **Subject Premises 5**.

17.    Based on your Affiant's training and experience and the probable cause established in the above-referenced affidavits, attached hereto and incorporated herein as Exhibit C and D, together with the following items:

    a)    The U.S. Currency, gold, coins and silver coins located at **Subject Premises 3, 4,** and **5**;

    b)    The application and rental agreement for **Subject Premises 6** found in **Subject Premises 3;**

    c)    The information provided to law enforcement by 24/7 Private Vaults regarding the matching retinal scans for Subject Premises 3 and 6; and

    d)    The information from 24/7 Private Vaults regarding ways in which individuals attempt to conceal their rental of safe deposit boxes at 24/7 Private Vaults,

your Affiant has probable cause to believe that the abovementioned safe deposit box application and rental agreement discovered at **Subject Premises 3** shows that the individual who rented and controlled **Subject Premises 3** is the same individual who rents and controls safe deposit box #1023 located at 24/7 Private Vaults located at 3110 East Sunset Road, Las Vegas, NV 89120, further detailed in "Attachment A," as **Subject Premises 6**.

17.    Further, based on the above-mentioned information and investigation, your Affiant has probable cause to believe that **Subject Premises 6** contains evidence of, fruits of, or property or proceeds traceable to, violations of Federal law, including possible violations of 21 §§ U.S.C. 841 and 846, 18 U.S.C. § 1956 and 1957, 31 U.S.C. § 5324 and 5313, or a conspiracy to commit such violations.

6

## CONCLUSION

I respectfully request that a search warrant be issued that authorizes the search of **Subject Premises 6**, described in Attachment A, and the search and seizure of the items described in Attachment B.

_/s/_

ROBERT NORRIS
Special Agent
IRS-Criminal Investigation

Subscribed and sworn to before me
this 5th day of October 2011.

Peggy A. Leen
United States Magistrate Judge

7

1

## ATTACHMENT A

2

## DESCRIPTION OF PROPERTY TO BE SEARCHED

3

4
**Subject Premises 6**

5
Safe deposit box # 1023 is located at 3110 East Sunset Road, Suite H, Las Vegas, NV 89120. This location is further described as located within 24/7 Private Vaults, a business located on the inner corner of an "L" shaped business complex; specifically, a safe deposit box with corresponding assigned number 1023.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## ATTACHMENT B

ITEMS TO BE SEARCHED FOR AND SEIZED AT **SUBJECT PREMISE 6**:

A. United States and foreign currency,

B. Precious metals,

C. Jewelry for which receipts or other documentation or admissions show was purchased on or after August 1, 2008,

D. Negotiable financial instruments including: stocks, bonds, securities, cashier's checks, money drafts, bearer bonds and instruments, and letters of credit,

E. Books, records, receipts, notes, ledgers, personal checks and other papers relating to the transportation, ordering, purchase and distribution of controlled substances,

F. Property deeds and other books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks,

G. Safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transfer, concealment, or expenditure of money,

H. Address and/or telephone books, digital pagers, address and/or telephone books, Rolodex indices, electronic organizers, and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers, e-mail addresses, facebook account information and other contact information related to co-conspirators, customers, financial institutions, and other individuals or businesses with whom a financial relationship exist,

I. Not more than 10 records or other items evidencing indicia of rental of the premises described herein, including, but not limited to rental, purchase or lease agreements, billing invoices, payment receipts, and keys,

J. Photographs, including still photos, negatives, video tapes, films, undeveloped film which depict precious metal or ther assets of an apparent value over $1,000.

9

Exhibit D - Search Warrant Inventory List of Deposit Box 4010 of 24/7 Private Vault

Exhibit D - Search Warrant Inventory List of Deposit Box 4010 of 24/7 Private Vault

**Seized Asset Summary**

Henri WETSELAAR

2010 R 00613, 2:11-cr-0347

| # | Warrant # | Evid Bag # | Type | Location/Asset | Description | |
|---|-----------|-----------|------|----------------|-------------|---|
| | 2:11-mj-0658-PAL | EM000008003 | Search & Seizure | 24/7 SDB #4010 | Documents | Apps for 1023 & 4025 |
| | 2:11-mj-0648-PAL | EM000008018 | Search & Seizure | 24/7 SDB #4010 | Precious Metals | |
| | 2:11-mj-0648-PAL | EM000008019 | Search & Seizure | 24/7 SDB #4010 | Foreign Currency | |
| | 2:11-mj-0648-PAL | EM000008020 | Search & Seizure | 24/7 SDB #4010 | Precious Metals | |
| | 2:11-mj-0648-PAL | EM000008020 | Search & Seizure | 24/7 SDB #4010 | Foreign Currency | |
| | 2:11-mj-0648-PAL | EM000008021 | Search & Seizure | 24/7 SDB #4010 | US Currency | |
| | 2:11-mj-0648-PAL | EM000008022 | Search & Seizure | 24/7 SDB #4010 | US Currency | |

Box4010_Summary.xlsx Warrant Inventory                                                    S/A Rob Norris, IRS-CI

Exhibit D-1 - U.S. Currency

Exhibit D-1 - U.S. Currency

**Seized Asset Summary**

Henri WETSELAAR

2010 R 00613, 2:11-cr-0347

| # | Evid Bag #s | Warrant # | Location/Asset | US Currency |
|---|---|---|---|---|
| 2 | EM000008021 & EM000008022 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | 397,335.00 |

Exhibit D-2 - Foreign Currency

Exhibit D-2 - Foreign Currency

# Foreign Currency Analysis

Henri WETSELAAR

2010 R 00613, 2:11-cr-0347

| SSE Bag # | Warrant # | Seizing Site | Origin | Denom | Count | Amount | Conversion | USD $ |
|---|---|---|---|---|---|---|---|---|
| _Converted to US Dollars ($) on 10/12/2011_ | | | | | | | | |
| EM000008019 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Australian | mixed | Multiple | 10,250 | 0.9532325 | 9,770.63 |
| _Currently outstanding and in custody as foreign currency_ | | | | | | | | |
| EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Iraq | 25000 | 20 | 500,000 | 0.00086 | 430.00 |

Exhibit D-3 - Precious Metals

| # | Evid Bag # | Warrant # | Seizing Site | Origin | Type | Wt. | Unit | Count | Description |
|---|---|---|---|---|---|---|---|---|---|
| 28 | EM000008018 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 1 | Liberty American Eagle |
| 29 | EM000008018 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Canada | Gold | 1 | oz | 2 | Maple Leaf |
| 30 | EM000008018 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Austria | Gold | 0.5 | oz | 10 | 1/2 oz. Gold Austrian Coin |
| 31 | EM000008018 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 2 | Liberty Buffalo Head |
| 32 | EM000008018 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Rep of China | Gold | 1 | oz | 1 | Panda Gold Coin |
| 33 | EM000008018 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | South Africa | Gold | 1 | oz | 4 | Krugerrand |
| 34 | EM000008018 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 2 | Liberty Gold Coin |
| 35 | EM000008018 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Australia | Gold | 1 | oz | 1 | Elizabeth II Mint 1987 |
| 36 | EM000008018 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 1 | Liberty Head Mint 1904 |
| 37 | EM000008018 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 5 | American Eagle Gold Bullion |
| 38 | EM000008018 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | unk | unk | 1 | Library of Congress |
| 39 | EM000008018 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Canada | Gold | 1 | oz | 10 | Maple Leaf |
| 40 | EM000008018 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Switzerland | Gold | unk | unk | 20 | Swiss Gold Coin |
| 41 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Rep of China | Gold | 5 | oz | 1 | Panda Gold Coin |
| 42 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Canada | Gold | 1 | oz | 5 | Maple Leaf |
| 44 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 2 | Liberty Buffalo Head - MS70 |
| 45 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 2 | Liberty Buffalo Head - PF 70 |
| 46 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Canada | Gold | 1 | oz | 2 | Maple Leaf |
| 47 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 3 | $20 St. Galldens - MS64 |
| 48 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 1 | 1984 Gold Olympiad |
| 49 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Canada | Gold | 1 | oz | 10 | Maple Leaf |
| 50 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | South Africa | Gold | 1 | oz | 2 | Krugerrand |
| 51 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Rep of China | Gold | 1 | oz | 1 | Panda Gold Coin |
| 52 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 0.5 | oz | 2 | Liberty 1/2 oz Gold Coin |
| 53 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 2 | Liberty 1 oz Gold Coin |
| 54 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | South Africa | Gold | 1 | oz | 2 | Krugerrand |
| 55 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 2 | Liberty 1 oz Gold Coin |
| 57 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 2 | Ultra High Relief Gold Coins - MS69 |
| 58 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 2 | Ultra High Relief Gold Coins - MS70 |
| 59 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 1 | Martha Washington Gold Coin |
| 60 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Austria | Gold | 1 | oz | 4 | Wiener Philharmonic Gold Coin |
| 61 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Austria | Gold | 1 | oz | 2 | Austrian Coin |
| 62 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | South Africa | Gold | 1 | oz | 3 | Krugerrand |
| 63 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 3 | Liberty $50 |
| 64 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | South Africa | Gold | 1 | oz | 3 | Krugerrand |
| 65 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 1 | Liberty Head Mint 1893 |
| 66 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | South Africa | Gold | 1 | oz | 1 | Krugerrand |
| 67 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | South Africa | Gold | 1 | oz | 1 | Krugerrand |

| # | Evid Bag # | Warrant # | Seizing Site | Origin | Type | Wt. | Unit | Count | Description |
|---|---|---|---|---|---|---|---|---|---|
| 68 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 1 | Liberty Gold Eagle Mint 1990 |
| 69 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 3 | Liberty Head |
| 70 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | South Africa | Gold | 1 | oz | 6 | Krugerrand |
| 71 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 3 | Liberty Head |
| 72 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Canada | Gold | 1 | oz | 1 | Maple Leaf |
| 73 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | Rep of China | Gold | 1 | oz | 1 | Panda Gold Coin |
| 74 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 1 | Liberty Buffalo Head |
| 75 | EM000008020 | 2:11-mj-0648-PAL | 24/7 SDB #4010 | United States | Gold | 1 | oz | 2 | Liberty Buffalo Head Ultra Cameo |

Exhibit E - Search Warrant Inventory List of Deposit Box 1023 of 24/7 Private Vault

Exhibit E - Search Warrant Inventory List of Deposit Box 1023 of 24/7 Private Vault

**Seized Asset Summary**

Henri WETSELAAR

2010 R 00613, 2:11-cr-0347

| # | Warrant # | Evid Bag # | Type | Location/Asset | Description | |
|---|-----------|------------|------|----------------|-------------|---|
| | 2:11-mj-0648-PAL | EM000008012 | Search & Seizure | 24/7 SDB #1023 | Documents | Apps for 1023 & 4025 |
| | 2:11-mj-0658-PAL | EM000008004 | Search & Seizure | 24/7 SDB #1023 | US Currency | |
| | 2:11-mj-0658-PAL | EM000008023 | Search & Seizure | 24/7 SDB #1023 | Precious Metals | |

Box1023_Summary.xlsx Warrant Inventory

S/A Rob Norris, IRS-CI

Exhibit E-1 - U.S. Currency

**Seized Asset Summary**

Henri WETSELAAR

2010 R 00613, 2:11-cr-0347

| # | Evid Bag #s | Warrant # | Location/Asset | US Currency |
|---|---|---|---|---|
| 4 | EM000008004 | 2:11-mj-0658-PAL | 24/7 SDB #1023 | 99,900.00 |

Exhibit E-2 - Precious Metals

| # | Evid Bag # | Warrant # | Seizing Site | Origin | Type | Wt. | Unit | Count | Description |
|---|-----------|-----------|--------------|--------|------|-----|------|-------|-------------|
| 17 | EM000008023 | 2:11-mj-0658-PAL | 24/7 SDB #1023 | United States | Gold | 1 | oz | 3 | Liberty Gold Coin 2009 Mint |